## WILLIAM K. LOTHROP AND OTHERS *vs.* JOHN W. STEDMAN, INSURANCE COMMISSIONER OF THE STATE OF CONNECTICUT.

The right of the judiciary to declare a statute void for unconstitutionality is only to be exercised in clear cases; and this rule applies with special force to decisions upon motions for provisional injunctions.

The principle that a stockholder of a company cannot maintain a bill in equity against a wrongdoer to prevent an injury to the corporation, unless it shall be averred, and shall affirmatively appear, that the corporation has refused to take measures to protect itself, does not extend to a bill which is in good faith filed by a creditor.

A holder of a policy in an insurance company is a creditor within this rule.

A charter is a contract between the state and the corporators, and the corporation takes the grant subject to the limitations contained in the act of incorporation. If no power of repeal is reserved, none can be exercised; but when a charter itself or a general statute provides that the charter is subject to repeal by the legislature, at its pleasure, the legislature has the right to exercise its power summarily and at will, and its action, being a legislative and not a judicial act, cannot be reviewed by the courts, unless it should exercise its power in such a manner as to clearly violate the principles of natural justice.

A repeal of a charter does not of itself impair the obligation of any contract which the corporation has entered into. But the legislature cannot establish such rules with regard to the disposition of the assets of the corporation, that the avails shall be diverted from or divided unfairly and unequally among the creditors, or that the portion of the avails which belongs to the stockholders shall be sequestered and diverted from the owners.

The legislature has the right to appoint a trustee, to take the assets and manage the affairs of a corporation, whose charter has been repealed, in conformity with the general and just rules which it has prescribed, or with the rules of a court of equity if no statutory provisions have been enacted. If no trustee is appointed by the legislature, a court of equity, which never allows a trust to fail for the want of a trustee, would see to the execution of the trust, although

· by the dissolution of the corporation the legal title to the property had been changed.

And where the public interest and the rights of creditors require it, the legislature may take away the custody of the assets of a corporation from its directors and commit it to an officer of the state, pending an investigation into the solvency of the company.

Where the legislature does an act within its powers, a statement of its reasons in a preamble will not affect the validity of its act.

A statute repealing a charter at a certain date, provided that if the company shall make up a deficiency in its assets before that date the charter shall remain in force, and appointing a special tribunal to determine whether the deficiency is made up, is not a delegation of legislative power, and is valid. A statute may be passed to take effect on the happening of a future event.

An inquiry by the legislature into the affairs of a corporation with reference to a repeal of its charter, is not a judicial act.

MOTION for a provisional injunction. United States Circuit Court, District of Connecticut. Before *Shipman, J.,* in chambers.

A bill for a permanent injunction had been filed September 11th, 1875, and on the same day the present motion was made, pending the hearing on which an *ex parte* injunction was granted. The facts are fully stated in the opinion.

*W. D. Shipman* and *W. W. MacFarland,* for the petitioners.

*S. E. Baldwin,* for the respondent.

SHIPMAN, J. The American National Life & Trust Company was incorporated by the General Assembly of the State of Connecticut in the year 1866, under the name of the American National Life Insurance Company. (The eighth section of the charter is as follows: " This resolution * * * may be altered, amended or repealed at the pleasure of the General Assembly.")

A statute of the state passed in 1871, relating in part to life insurance companies, and creating the office of insurance commissioner, provided in substance, that if it should appear to the commissioner from any report, valuation or examination of any life insurance company, that the assets of any such company incorporated by this state were less than its liabilities, the commissioner should, at his discretion, bring a petition to the proper court of probate, praying for the appointment of a trustee to take possession of the property

of such company for the benefit of its creditors; and, if it should appear that the assets were less in amount than three-fourths of the liabilities of such company, the act made it imperative upon the commissioner to bring such petition without delay.

On November 23d, 1874, the respondent, then and now insurance commissioner of this state, preferred his petition to the proper probate court, alleging that the result of an examination of the financial condition of the American National Life & Trust Company, and a valuation of its policies and assets, disclosed that the assets of the company were less than its liabilities, and less than three-fourths of its liabilities, and praying for the appointment of a trustee. After a full hearing, the probate court having called to its assistance a judge of the Superior Court, in pursuance of a statute of the state, found that "the allegation that such assets are less than three-fourths of the liabilities is untrue, that the allegation that the assets of said company are less than its liabilities is true, and the court further finds that the deficiency is not such that the prayer of the petition should be granted," and dismissed the petition. The insurance commissioner presented to the General Assembly, at its May session, 1875, a special report upon the affairs of this company, and at the same session the legislature passed the following joint resolution:—

"Whereas the American Mutual Life Insurance Company of New Haven has transferred its assets to the American National Life & Trust Company of New Haven, and has ceased business, said last-named company assuming the liabilities of said American Mutual Life Insurance Company; and whereas it appears from the report of the insurance commissioner relating to the affairs of said American National Life & Trust Company, that the liabilities of said company exceed its assets more than $400,000; and whereas said company has neglected and refused to render to the insurance commissioner a report of its condition and affairs as required by law:—therefore,

"*Resolved by this Assembly,* That the charter of said American Mutual Life Insurance Company and the charter of

said American National Life & Trust Company shall, on the 1st day of September, 1875, be and become wholly and absolutely repealed and annulled; *Provided however*, that if said American National Life & Trust Company shall, before said 1st day of September, 1875, supply the deficiency existing in its assets, and receive from the insurance commissioner a certificate showing that the assets of said company are sufficient to satisfy all outstanding and unpaid debts and claims, and to provide a full reinsurance reserve upon its policies in force, to be ascertained as now required by law, then the charter of said companies shall remain in full force, and shall not, by this resolution, be repealed or annulled; *Provided further*, if there shall be any disagreement between the insurance commissioner and said American National Life & Trust Company as to the amount of assets, their value and their sufficiency, the Chief Justice of the Supreme Court of Errors shall, upon the application of either the insurance commissioner or said company, designate one of the judges of the Superior Court to sit with him, and they shall fully hear the parties and determine the amount of such assets, their value and sufficiency, and their determination shall be conclusive; and they shall thereupon issue their certificate of the amount of the deficiency, if any, to be paid in; and if said company shall, within thirty days after the delivery of said certificate to the secretary of said company, pay in the deficiency therein stated, this resolution shall become inoperative and void. The decision of said judges shall be made, and said certificate shall be delivered to said secretary, before November 1st, 1875. *And provided further*, that in case of a disagreement between the said company and the insurance commissioner as to the value or sufficiency of its assets, and said company does not supply the deficiency in its assets on or before the 1st day of September, 1875, the insurance commissioner shall then and thereupon, on said 1st day of September, 1875, take possession of all the assets, books and papers of said company, and hold the same subject to the order of said Chief Justice, and to be disposed of as provided by law."

At the same session the legislature passed a statute in

Lothrop *v.* Stedman.

regard to the disposition of the assets of life insurance companies upon the repeal of their charters, providing, in substance, that the title of the assets of any such corporation should vest absolutely, and in fee simple, in the insurance commissioner, who should hold and dispose of the same for the use and benefit of policy holders of such company, and such other persons as may be interested in such assets, and divide the avails in a specified order, and be subject to the direction and control of the Superior Court for the county within which the corporation should be situated.

The American National Life & Trust Company did not, prior to September 1st, 1875, supply to the satisfaction of the commissioner the alleged deficiency in its assets, and disagreed with that officer in regard to the amount, value and sufficiency thereof. He made preparations to take possession of the property of the company on September 1st, 1875, and prior to the investigation by the Chief Justice and his associate. The company thereafter brought a petition before the Superior Court for New Haven county, to enjoin the commissioner against his proposed action; a temporary *ex parte* injunction was granted, which was dissolved by Judge BEARDSLEY, on motion of the insurance commissioner, and after a hearing of the parties. A temporary and *ex parte* injunction has also been granted by Judge ROBINSON, of the Court of Common Pleas, upon the petition of the insurance commissioner, to restrain the directors and executive officers of the company from disposing of its assets.

Sundry citizens of the state of New York who hold and own policies of insurance which have been issued by said company, on which it is liable to pay, by virtue of lawful contracts heretofore entered into, have brought their bill in equity before this court against the commissioner and said corporation, alleging its solvency, praying that the commissioner be enjoined against taking possession of said assets, and that the company be enjoined against delivering such possession, mainly and principally upon the ground that the resolution of the General Assembly which has been quoted, and which is the foundation of the authority of the commissioner so to take

possession, is void and of no effect. The reasons which are urged in support of this position will be stated hereafter. The complainants have also moved for the issuing of a provisional injunction to restrain the commissioner from taking possession of the assets of the company until the final hearing of the bill, and upon this motion counsel for the complainants and for the commissioner have been heard at length.

The only question now to be decided is, whether a provisional injunction should be granted?

The general principles of law which are involved in this case are of great importance, and concern pecuniary interests in this country of no ordinary magnitude, and would justify me in taking more time for the consideration of this motion than I am now able to give. It is proper that a hearing, which will soon take place before Chief Justice PARK and his associate, in regard to the value of the assets of the company, should not be embarrassed by the pendency of any undecided motions in this court, and it is due to the policy-holders in this company that they should be speedily apprised by the decisions of courts in regard to the management of its property. These considerations demand a prompt decision, and prevent anything more than a succinct statement of the principles which I deem applicable to the case.

It is obvious at the outset, that the question I am asked to determine has always been considered by courts one of grave importance.

"The right of the judiciary to declare a statute void and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave, that it is never to be exercised except in very clear cases; one department of the government is bound to presume that another has acted rightly. The party who wishes us to pronounce a law unconstitutional takes upon himself the burden of proving beyond doubt that it is so." *Erie & N. E. Railroad Co.* v. *Casey*, 26 Penn. S. R., 287, per BLACK, J.

It should be a very clear case to justify a court in deciding that an act of the legislature is invalid, upon a motion for a provisional injunction, a proceeding which addresses itself particularly to judicial discretion.

The defendant corporation is a stock corporation authorized to issue life policies upon the mutual plan of insurance, but it is not strictly a mutual insurance company, and the policy-holders are not necessarily members of the corporation, and have no right to participate in its management. The complainants appear before the court only as creditors of the company. Being citizens of the state of New York, they have a right to bring this bill against the defendants, citizens of Connecticut, and their interest as creditors of the corporation and *cestuis que trust* of the fund which is now in the control of the directors of the corporation, entitles them to maintain their suit if they have suffered injury. The principle that a stockholder of a company cannot maintain a bill in equity against a wrongdoer to prevent an injury to the corporation, unless it shall be averred, and shall affirmatively appear, that the corporation has refused to take measures to protect itself, does not extend to a bill which is in good faith filed by a creditor.

It is suggested that the questions in this case are the same as those which are stated in the petition of the insurance company now pending in the Superior Court, and that they have already been virtually passed upon by the decision of Judge BEARDSLEY. While the decision of any judge upon a motion for a temporary injunction is not a controlling authority, yet it is true that the same general questions which are here presented were discussed in an argument before Judge BEARDSLEY, and the fact that an eminent judge of this state had in effect refused the injunction when it was urged by the insurance company, should properly lead me to exercise caution before I granted it in an action which, though brought by the policy holders, the affidavits on file in this case tend to show was instituted at the instance of the company.

The counsel in the case are not seriously at issue as to the principles which are applicable to the repeal of charters by legislation.

A charter is a contract between the state and the corporators, and the corporation takes the grant subject to the limitations which are contained in the act of incorporation. If no

power of repeal is reserved, none can be exercised; but when a charter itself or a general statute provides that the charter is subject to repeal by the legislature, at its pleasure, without restrictions or conditions limiting the power of repeal, the legislature has the right to exercise its power summarily and at will, and its action, being a legislative and not a judicial act, cannot be reviewed by the courts, unless it should exercise its power so wantonly and causelessly as palpably to violate the principles of natural justice, and in such case a repeal, like other legislative acts which do thus palpably violate the principles of natural justice, may be reviewed by courts. The power of the legislature therefore is not unlimited, for the private rights of persons are not subject to an unjust and despotic exercise of power by a legislature without means of redress. "The theory of our governments, state and national, is opposed to the deposit of unlimited power anywhere; the executive, the legislative and the judicial branches of these governments are all of limited and defined power." *Loan Association* v. *Topeka*, 20 Wall., 663. It is always to be presumed that the legislature has exercised its great powers for adequate cause, and the extreme caution with which legislatures ordinarily act upon the subject of the repeal of charters fully warrants such a presumption.

It is to be observed that this charter, like the majority of Connecticut charters, provides that it may be repealed "at the pleasure of the General Assembly." It is unlike the charters in the Pennsylvania cases of *Erie & N. E. Railroad Co.* v. *Casey*, 26 Penn. S. R., 287, and *Commonwealth* v. *Pittsburgh & Connellsville Railroad Co.*, 58 id., 46, which provided that, if the companies should abuse or misuse their franchises, the charter should be subject to repeal. There is no question here whether the legislature is or is not the final judge whether the contingency upon which the authority to repeal is based has occurred. The language of this charter is also unlike the charter which was examined in *Allen* v. *McKeen*, 1 Sumn., 276, which provides that the legislature could alter, limit, restrain or annul the *powers* conferred, and in which case the court held that a right of absolute repeal was not reserved.

The right of repeal is here expressly reserved, is to be exercised at the pleasure of the General Assembly, and is subject only to the limitation which I have suggested.

It is not material whether the court of probate had or had not decided that it was not expedient to appoint a trustee. That court simply found that the company was insolvent, but · that its assets were not less than three-fourths of its liabilities. The finding, or the opinion of the court, did not debar the legislature from taking such legislative action as it deemed just.

A repeal of a charter does not of itself violate or impair the obligation of any contract which the corporation has entered into. But the legislature cannot establish such rules in regard to the management and disposition of the assets of the corporation, that the avails shall be diverted from or divided unfairly and unequally among the creditors, and thus impair the obligation of contracts, or that the portion of the avails which belong to the stockholders shall be sequestered and diverted from the owners, and thus injure vested rights.

"The capital and debts of banking and other moneyed corporations constitute a trust fund and pledge for the payment of creditors and stockholders, and a court of equity will lay hold of the fund and see that it be duly collected and applied. * * * A law distributing the proceeds of an insolvent trading or banking corporation among its stockholders, or giving it to strangers, or seizing it to the use of the state, would as clearly impair the obligation of its contracts, as a law giving to the heirs the effects of a deceased natural per- · son, to the exclusion of his creditors, would impair the obligation of his contracts." *Curran* v. *State of Arkansas*, 15 How., 312.

The legislature has also the right, as an administrative measure, to appoint a trustee, to take the assets and manage the affairs of a corporation whose charter has been repealed, in conformity with the general and just rules which it has prescribed, or with the rules of a court of equity, if no statutory provisions have been enacted. If no trustee is appointed by the legislature, " a court of equity, which never allows a

trust to fail for want of a trustee, would see to the execution of the trust, although by the dissolution of the corporation the legal title to the property had been changed." *Curran* v. *State of Arkansas*, supra.)

The complainants do not controvert, in the main, the principles which have been stated, but they contend that, while the legislature had the right to repeal this charter, it has not been in fact repealed; (and, if it has been repealed, that the provisions by which the commissioner was appointed to hold the assets subject to the order of the Chief Justice, who does not act as a judge, but merely as a committee, and whose directions are not subject to appeal or review, and the provision that the title to the assets shall be vested in the commissioner, are invalid, and that the resolution is void.

It is contended that:—

1. The preamble is void, because the legislature has no power to find facts which may affect private rights, and that the preamble is so interwoven with the resolution, that, being void, the resolution is void also.

It is true that the facts recited in a preamble of a private statute are not evidence, as between the person for whose benefit the act was passed and a third person, and that a legislature has no power to find facts by legislative enactment, so as to be evidence in suits against persons who were not applicants for the act. *Elmondorff* v. *Carmichael*, 3 Little, 472; *Parmelee* v. *Thompson*, 7 Hill, 80. This is an obvious rule of evidence, but it has no application here. If, as is admitted, the legislature had power to repeal the charter, it had the power to state the reasons which induced it to act. A statement of the reasons was not indispensable to the validity of the repeal, but was proper for the information of the public and of the corporation. (This resolution is not a judicial act, finding that a forfeiture of the charter has taken place. If it was, it could well be urged that a legislature has not ordinarily judicial powers, and that the attempt to exercise judicial functions is void; but the resolution is a legislative act, declaring the repeal, and not the forfeiture of the charter, and the recitals are not in the nature of judicial findings of

facts, but the statement of the reasons which operated upon the legislative mind.

"The inquiry into the affairs or defaults of a corporation with a view to continue or discontinue it, is not a judicial act. No issue is formed. No decree or judgment is passed. No forfeiture is adjudged. No fine or punishment is imposed. But an inquiry is had in such form as is deemed most wise and expedient, with a view to ascertain facts upon which to exercise legislative power, or to learn whether a contingency has happened upon which legislative action is required." *Crease* v. *Babcock*, 23 Pick., 344.)

2. The complainants insist that the legislature must of itself determine whether an enactment shall or shall not be a law, and cannot delegate the power to make or repeal laws; that the attempted repeal of this charter is delegated to the insurance commissioner, and is therefore void.

The resolution provides that the charter shall be repealed on September 1st, 1875; provided, that if the company shall, before that day, receive a certificate that the deficiency in its assets has been supplied, then the charter shall remain in full force; and, in case of a disagreement between the commissioner and the company as to the amount of its assets, the Chief Justice and his associate shall determine and state the amount to be paid in, and if the amount so found shall be paid within thirty days, the resolution shall be inoperative and void. I am inclined to the opinion that, by this resolution, the charter was repealed, but the repeal was not to take effect, or be operative, if a specified event should thereafter take place, which event was uncertain. The commissioner, subject to an appeal to the Chief Justice and a judge of the Superior Court, was to determine whether that event had taken place. The legislature, for itself, determined and enacted that the charter should be repealed, provided an event did not occur in the future; the ascertainment and announcement that the event had happened the legislature entrusted to an officer, or a committee, whom it designated. The legislature delegated to no one the power to determine whether the charter should or should not be repealed. It delegated the

duty of ascertaining whether a fact existed, upon the exist-
ence of which it had determined that the repeal should not go
into effect.

"A valid statute may be passed to take effect upon the hap-
pening of some future event. Certain, or uncertain, it is a
law *in presenti*, to take effect *in futuro*. The event, or change
of circumstances, must be such as, in the judgment of the
legislature, affects the question of the expediency of the law.
The legislature in effect declares the law inexpedient if the
event should not happen, expedient if it should happen. They
appeal to nobody to judge of its expediency." *Barto* v. *Him-
rod*, 8 N. York, 483, per Ruggles, C. J.

3. The complainants further say that the charter is not
repealed until after the decision of Judge PARK and his asso-
ciate; that the legislature has no power, either before or after
the repeal, to take the assets of an insurance company out of
the hands of its officers, and to transfer the custody of the
property to a third person, who is to hold them, subject to the
order of an individual, acting not as a judge, and exercising
no judicial functions, and not necessarily guided by the prin-
ciples of law, and from whose order there is no appeal; that
the resolve is a special and personal statute, prescribing an
exceptional and peculiar rule of conduct upon this single cor-
poration, and therefore unjust, and in violation of legislative
power.

The original resolution, which was reported to the legisla-
ture, contained the first proviso only. As reported, it mani-
festly provided that the charter should be repealed on Sep-
tember 1st, 1875, unless, upon the happening of a certain
event, the repeal should not go into effect. An amendment
was added, by which in case of disagreement between the
commissioner and the insurance company, another committee
was appointed to ascertain the amount of deficiency, if any,
and if the amount, so ascertained, should be paid in, the res-
olution should be inoperative *and void*. It is a question which
it is not now necessary to determine, whether the charter is
already repealed or whether its repeal occurs at the expiration
of the time which is limited for payment of the deficiency, if

any there be, which may be found by the two judges, and upon non-payment of the amount. I have already suggested that the true construction is that the charter is repealed, to take effect or not to take effect upon the happening of an uncertain event. If the charter is repealed, there can be no doubt of the power of a legislature to appoint some person to act merely as custodian of the assets of the corporation. But assuming that the charter is now in existence and unrepealed, I am of the opinion that the legislature has the power, if in their opinion the public interest and the rights of the creditors of a particular corporation demand it, to take away the custody of the assets of such corporation from its directors and intrust the custody to an officer of the state, pending an investigation into the company's solvency, and the determination of the fact whether the event has happened upon which a repeal of the charter will take place. It is apparent from an inspection of the resolution that the legislature deemed the corporation insolvent, and that the liabilities exceeded the assets $400,000, and also was of opinion that the corporation had not complied with the requirements of law, and that the affairs of the company were in so precarious a position that it was proper to take the unusual step of repealing the charter. But the legislature was also willing to give the company an opportunity of making good the deficiency, and further was willing not to permit the decision of the insurance commissioner, upon the question whether the deficiency had been supplied, to be final, but to intrust the final hearing and determination in regard to the sufficiency of assets to two persons, whose judicial position peculiarly adapts them to pass upon disputed questions of fact, and whose official character precludes the suspicion that injustice might be done, and should assure the creditors that their rights are to be guarded. That investigation would necessarily consume time. The question presented itself, do the interests of the *cestuis que trust* in the property of the company require that, during the investigation, the assets, which in our opinion have seriously been impaired, shall remain in the hands of the directors? The legislature decided to place the assets, for the time being, in

the custody of an officer of the state, and derived their power so to do from the general power which had been reserved over the affairs of this particular corporation, that of amendment of its charter at its pleasure. "Whatever might be true if the charter was a close one, the General Assembly could impose upon the defendants any additional conditions or burthens connected with the grant which they might deem necessary for the protection or welfare of the public, and which they might originally and with justice have imposed." ) *English* v. *N. Haven & Northampton Co.*, 32 Conn., 243; *Commissioners* v. *Holyoke Water-Power Co.*, 104 Mass., 446. It is not necessary that the resolution should be styled an amendment. *Bishop* v. *Brainard*, 28 Conn., 298. The legislature has reserved to itself the control of this charter, and can modify it to meet any exigency which may arise in the affairs of the corporation; and where the legislature has determined that the pecuniary interests of the creditors are so imperilled that the necessity of repealing the charter may arise, it would seem that the legislature has the power to provide that the officer, who has the oversight of all the insurance companies of the state, is the proper person to have the exclusive custody of the assets of this corporation, and act as the treasurer for the time being. The legislature could originally have imposed this condition upon the company; they can impose it at any time when they deem it necessary for the protection or welfare of the corporation.

It is also earnestly contended that the resolution directs the commissioner to hold the assets subject to the order of a committee, not acting judicially, and from whose order there is no appeal, and who in his directions is not necessarily acting in conformity with principles of law.

It is true that the Chief Justice will act as a committee or agent of the legislature, and not strictly in his judicial capacity, and if the resolution and the general statutes in regard to life insurance corporations, whose charters have been repealed, placed the assets under the control of a committee, to be disposed of as the committee pleased, and without the control of the courts of the state, such acts would properly be

the subject of severe criticism, and might be declared to be inoperative. This resolution simply empowers the commissioner to hold the assets. He cannot sell or dispose of them under the resolution, but is merely their custodian.

The Chief Justice has only authority to notify the commissioner, either to return the assets to the company, or that the event has not taken place upon which the repeal of the charter is avoided, after which the commissioner is to be governed by the general statute. He then becomes a trustee under the exclusive direction and control of a court of equity, and subject to its decrees.

The assets are not to be managed or disposed of, and the avails are not to be paid, in accordance with the order of a committee, but in pursuance of the general statutes and under the direction of the Superior Court, a court of general jurisdiction and of full chancery powers. The weight of the complainants' argument bore upon the clause of the resolution which they considered most unjust and prejudicial to their interests. I think that they misapprehend the nature of the powers of the Chief Justice over the assets, which is so limited that there is no interference with the rights of creditors.

Upon the argument of the motion the provisions of the general statute were criticised by the complainants. The bill does not ask for the interference of the court upon the ground of the invalidity of the statute, but the court is asked to prevent the commissioner from taking possession of the assets under the authority of a resolution of the General Assembly which is alleged to be void. I do not deem it therefore incumbent upon me at this time to consider the character of the statute.

The suggestion which has been made in regard to the control of the legislature over those charters in which a power of amendment or repeal has been reserved, applies to the objection that this resolution is a special and peculiar law by which the rights of this corporation are to be jeopardized, differing from the law applicable to all other corporations in like condition. All insurance companies in Connecticut are created by special charter. Each company is under the particular

supervision of the legislature, and is liable, in case of insolvency or malfeasance, to be controlled by such action, applicable to the special case, as shall serve to protect creditors, or shareholders, or the public.

Sundry affidavits were read for the purpose of showing that Mr. Stedman had not informed the company, prior to September 1st, of the amount of the alleged deficiency, and had not given the company an opportunity to supply the required amount, and had not acted justly towards the company since the passage of this resolution. Counter affidavits were presented by the commissioner. If any steps were to be taken by the commissioner in advance of the action of the company, prior to September 1st, in regard to which I express no opinion, I am not satisfied that the commissioner failed to do whatever the resolution, or the statutes, or the duty which he owed to the corporation, or to the public, imposed upon him. The corporation does not seem to me to have suffered in consequence of a neglect of the commissioner to keep them informed of his views and wishes.

The motion for a provisional injunction is denied, and the restraining order now in force is vacated.

# APPENDIX.

## OBITUARY NOTICE OF RALPH D. SMITH.*

RALPH DUNNING SMITH, the oldest member of the New Haven County bar remaining in active practice, died on September 11th, 1874, at the age of sixty-nine years. Born in Southbury in 1804, he was graduated at Yale College in the class of 1827, commenced the study of law with Hon. Edward Hinman, at his native place, and then, after spending some time in the office of Heman Birch, Esq., of Brookfield, completed his preparation for the bar in the Yale Law School in 1831. He entered the profession in the fall of that year, established himself in Guilford, and there, for more than forty years, was the leading spirit of the town.

Without any of the graces of oratory, and with not a particle of sham or show in his character, it was not Mr. Smith's ambition to distinguish himself as an advocate or a politician. His leading characteristics as a practitioner were a thorough acquaintance with the Common Law, industry in the preparation of his cases, persistency in maintaining the interests of his clients to the end, undiscouraged by any adverse decision so long as a hope of reversing it remained, accuracy in his statements, and fair dealing with all.

His business was largely that of an office lawyer, and he was often consulted by persons living in other counties, not unfrequently being engaged in trials in Middlesex and New London, either as counsel, arbitrator or committee. His most important professional work was done in connection with the New Haven and New London railroad, the construction of which his exertions helped greatly to secure. He was for many years the secretary of the railroad company, as well as one of its directors, acting also as its attorney in the matter of its location, land purchases, construction contracts, &c., and took a prominent part in the organization and management of the New London and Stonington extension, and thus in making Guilford a point upon a new through route between New Haven and Boston.

No lawyer in the state, probably, ever had a better knowledge of the local history and real estate titles of his town. For six years the judge of his probate district, and during all his professional life much engaged in the settlement of estates, Mr. Smith had frequent occasion to consult the ancient town, church, and probate records, and thoroughly mastered their contents. He could trace the families of the early planters of Guilford— one of the first settlements within the limits of the New Haven Colony—

---

* Prepared, at the request of the Reporter, by Simeon E. Baldwin, Esq., of the New Haven County bar.

down from generation to generation, point out the homestead lot which belonged to each, and turn to the record of the "terrier" under which the original title was derived.

It is indeed as an enthusiastic antiquarian and genealogist that Mr. Smith will be best remembered. He was for many years a valued director of the New Haven Colony Historical Society, and has left in manuscript, sketches of the history of Guilford, and of two of its ecclesiastical societies, and biographical minutes, more or less full, in relation to every person who was graduated from Yale College, from its foundation down to 1767. His attachment to the college was very great, and there were few commencements at which he was not in attendance. He had two sons, both of whom were graduates of Yale, and of remarkable promise, but their early deaths, occurring, in the case of each, within a year or two after graduation, cast a deep shadow over the last years of their father's life.

Mr. Smith was an active member of the First Congregational Church in Guilford, and was honored by all his townsmen as a man of a consistent Christian life. At his funeral a commemorative discourse was pronounced by Rev. Dr. Leonard Bacon, of New Haven. Resolutions expressive of their respect for his memory were passed by the bar of New Haven County, in which especial mention is made of "the ripeness of his learning and the soundness of his judgment, his faithfulness to the interests of his clients, and the punctual performance of his professional engagements."

## OBITUARY NOTICE OF GEORGE PRATT.*

George Pratt died at his home in Norwich on the 4th of June, 1875, after a severe illness of nearly three weeks. He was in the full vigor of manhood, being forty-two years of age, and had arrived at a period of his professional career which was most honorable to himself, and gave promise of great eminence and usefulness for the future. Mr. Pratt was born in East Weymouth, Mass., on the 12th of October, 1832. He received such early education as the public schools of his native town afforded, with such as was derived from diligent and omniverous reading. His literary tastes were developed early, and in his very boyhood he not only read books of the best class, but was an author himself in a limited way, and both prose and poetry from his pen found their way into the columns of the periodical press. East Weymouth was a shoe-making village, and, like many of the

* Prepared, at the request of the Reporter, by Mr. W. H. W. Campbell, of Norwich.

young men of the place, Mr. Pratt learned the trade, and worked at it for several years in the intervals of attending school and teaching. By this and other means he supported himself entirely after the age of ten years, besides contributing to family expenses, and he also obtained a portion of the funds which afterwards procured for him a liberal education.

Having gone through the several grades of the public schools with brilliant success, Mr. Pratt prepared for college at the Providence Conference Seminary, East Greenwich, R. I., and entered Wesleyan University, at Middletown, in 1851. He left that institution, however, in Freshman year, and began teaching school, having become possessed of the idea that his college training gave him no sufficient tax and discipline, and that his time might be better employed in purely self-education. Nevertheless he was persuaded to make a fresh trial, and entered the Freshman Class at Yale in 1853. He was quite inadequately fitted, according to the Yale standard at that time, and his deficiency in this respect proved a disadvantage during his collegiate course. He, however, graduated with an average standing in scholarship, and with a rank among the best in his class for literary and forensic ability. After graduation he taught school for a short time in the state of New York, employing his leisure hours in the study of the law. In 1858 he removed to Salem, in this state, and entered the law office of the Hon. John T. Wait at Norwich Town as a student. He was admitted to the bar in April, 1859, and in 1860 opened a law office in Norwich. His industry and steady application to business, added to his native ability and sterling character, caused him to rise rapidly in his profession. In a few years he acquired an active practice, and during several years prior to his death he was engaged in most of the causes of importance in the eastern section of the state. He was devoted to his profession, and was earnest and untiring in its pursuit. To a disciplined mind and a comprehensive legal knowledge, he added sound judgment, practical tact, and clear discrimination. He had a habit of mind which stood him in good stead both professionally and in his literary studies—a habit of mentally cataloguing and retaining in memory such sources of information as fell under his notice, so that one could rarely question him on a topic concerning which, if he had not personal knowledge, he had not mentally noted a trustworthy authority. As an advocate he was earnest, direct and forcible, rather than eloquent or showy. His arguments were always listened to with great attention by the court. The Connecticut Reports for the last ten or twelve years furnish ample testimony to the thoroughness and ability with which he prepared and prosecuted cases before the Supreme Court of Errors. He was a man of great discretion and fidelity in business trusts, and was counsel to some of the leading business institutions of the city of his residence. At the time of his death he occupied a position in the front rank of his profession in the state, and had acquired a large and lucrative practice.

Mr. Pratt's chosen career was professional rather than political. He

was, however, elected to the General Assembly in 1860 by the Republicans of the town of Salem, and in the years 1864, 1865, and 1869, he was one of the representatives of Norwich in the same body. During his legislative service he was a member of several of the important committees. He was an assiduous worker both in the committee room and in the House, courting labor, and thoroughly informing himself upon every important current question. He was the author of several measures of consequence, among which may be mentioned the registry and the flowage laws. He was, on both the occasions when the question first came up, one of the most ardent advocates of the impartial suffrage amendment to the Constitution of Connecticut. This was the only public office held by Mr. Pratt, if his six years term of service on the Board of Education be excepted, and also the position of corporation council which he held at the time of his death.

From this sketch of Mr. Pratt's life it will be seen that he was, in a proper sense of the term, a self-made man. He was ignorant of the art of wasting time, and had an utter distaste for all forms of dissipation, so that in college (as in his subsequent life) he maintained an unblemished moral character, and acquired those habits of patient and constant application which distinguished him ever after. He was naturally a devout man. Brought up a Methodist, he entered the Episcopal communion during his senior year in college. He was for several years a warden of Trinity Church, Norwich, and superintendent of its Sunday-school. He clung with peculiar tenacity to his beliefs, and never permitted a cherished article of faith to be assailed in his presence without defence. Religion was with him a matter of principle rather than sentiment, and duty was never performed in a merely formal or perfunctory manner.

He was public spirited in a high degree, and was always awake to all things concerning the general welfare. He was an earnest friend of the public school system, and served actively and usefully on the Board of Education. He was chosen a trustee of the Otis Library in place of the deceased Senator Buckingham. He was prominently connected with all important public interests, and in matters relating to schools, libraries, and other institutions affecting the public improvement, he exercised a lively solicitude.

Mr. Pratt had little of the political partizan in him, though his convictions were decided and fervent. He had a thorough contempt for dishonesty and artifice in public life, and, though by nature ambitious, scorned to purchase political honors by any sacrifice of his personal independence, or his principles, or by any catering to popular prejudice. He was well informed in political affairs, and was unusually qualified for a public servant.

Aside from his profession he had decided literary tastes, which from his boyhood he never ceased to cultivate. He was the author of many pamphlets and addresses, and, in former years especially, of many graceful poems and miscellaneous writings. He always made a point of interesting

himself in some special subject of study and investigation—church history, political economy, colonial history, &c. During several of his later years he had been collecting material for a history of the period immediately preceding the American Revolution. A considerable portion of this work was arranged and partially composed, although, according to his usual habit of literary work, none of it was committed to paper. There were few if any men in his own community whose general reading was more extensive. Even his diversions, aside from his frolicsome hours with his children, were of a decided literary and studious cast.

The sunnier side of Mr. Pratt's character was best known to his immediate family and intimate friends. While a most genial companion in his chosen society, he often presented in public a quiet and abstracted, even reserved, manner. But he was one of the truest friends who ever lived, and one of the most faithful confidants. The circumstances of his life amply explain many characteristics of his outward appearance, which presented him more to casual public view as the active, indefatigable, pushing lawyer, than the genial and true hearted man he was. His success in life has in it a lesson and an encouragement for all young men, in however humble circumstances. It was due rather to the sterling qualities beneath the surface of his character than to those more apparent traits which may have been popularly presumed to be the secret of it. He was not at all aided by adventitious circumstances, but was a fair example of one who, by strict adherence to the homely and wholesome maxims which too many young men despise, gained a legitimate reward.

During his residence in Salem Mr. Pratt was married to Sarah V., daughter of the Hon. Oramel Whittlesey, of that town. She survives him, with three sons and two daughters. His remains were laid to rest in the private burial ground of the Whittlesey family in Salem.

## OBITUARY NOTICE OF DANIEL P. TYLER.

DANIEL PUTNAM TYLER, a prominent member of the Windham County bar, and for many years one of the leading politicians of the state, died at his residence in Brooklyn in that county on the 6th of November, 1875, at the age of seventy-seven. His grandmother on his father's side was a daughter of the Revolutionary hero, General Israel Putnam. Young Tyler was educated in the common schools of Brooklyn and at the Plainfield Academy, and had prepared to enter college when he was commissioned as second lieutenant in the United States army, which position he resigned a few years after to engage in the study of law. He was admitted to the

---

---

Windham County bar in 1822 and immediately entered upon the practice of his profession in Brooklyn. He was soon after appointed clerk of the Superior and County Courts in that county, which office he held for fifteen years. He was one year Judge of the County Court, was Secretary of the State in the years 1844 and 1845, and represented Brooklyn in the General Assembly in 1838. The last public office which he held was that of Collector of Internal Revenue for the state of Arkansas, to which office he was appointed by President Lincoln and which he held for two years.

In the practice of his profession Mr. Tyler always enjoyed the reputation of an honorable man, and was distinguished for his untiring devotion to the interests of his clients. He was not, however, a close student of the law, and lacked the mental constitution that could have made him a profound lawyer. Of an impulsive nature, and very susceptible to the inspiration of occasions, especially to that of an enthusiastic assemblage, he was more fitted for popular oratory, and in this field won his special triumphs. He was one of the most effective political speakers that the state has ever produced. Not only were his services sought in all important elections in this state, but he was frequently invited to address large assemblies in other states during exciting political campaigns. His public speeches sparkled with wit, making him exceedingly popular with the masses. But while his wit was perhaps his most effective weapon, at least the one that seemed readiest at his hand, he was able to electrify an audience, when really inspired himself, by an outburst of genuine oratory.

Mr. Tyler continued in the practice of his profession in Brooklyn with the occasional interruptions involved in the holding of public offices that required him to reside elsewhere, down to the time of his death, and during the last year of his life made one of the happiest forensic efforts of his life in an important and exciting criminal trial before the Superior Court in Windham county, in which he was the leading counsel.

He was married in early life, but his wife died several years before him. He left no children.