# Hand *et al. v.* Stapleton *et al.*

## *Bill for Injunction.*

1. *Statutes; contingent legislation; constitutional law.*—The legislature may pass a valid statute, to take effect upon the happening of a future event, and may delegate to an officer or person the power of determining and announcing whether such event has happened.

2. *Same; constitution 1875, Art. I, Sec. 22; act to provide for removal of county seat of Baldwin county.*—The act entitled "An act to provide for the removal of the county seat of Baldwin county," (Acts, 1900-1, p. 754,) which provides for the removal of the court house and provides that the act shall not take effect until commissioners thereby created shall ascertain that its removal will not require an increase of the tax rate to pay the cost of same, is not repugnant to section 22, article I, of the constitution of 1875, which provides that "No power of suspending laws shall be exercised except by the General Assembly;" as the legislature determined for itself the expediency of the act's going or not going into effect, and the suspension of the act was exercised by the legislature and not by the commissioners.

3. *Statutes; conflicting sections; how construed.*—As between conflicting sections of the same act, the last in order of arrangement will control, and such conflict or inconsistency will not nullify the entire enactment, where the intention of the legislature can be effectuated by giving effect to the latter section and others in harmony with it

APPEAL from the Mobile Chancery Court.

Heard before the Hon. THOMAS H. SMITH.

The bill in this case was filed by Gus D. Stapleton and others, resident tax payers of Baldwin county, Alabama, against James D. Hand and others, commissioners appointed by the act of the General Assembly entitled "An act to provide for the removal of the county seat of Baldwin county, Alabama, from Daphne in said county to Bay Minette in said county," (Acts, 1900-1, p. 754), and against the probate judge, treasurer and court of county commissioners of said county.

The object and purpose of the bill, as well as the grounds of demurrer passed on by the court, are sufficiently shown by the opinion.

From a decree overruling said demurrers defendants appeal.

WM. A. COLLIER and BROMBERG & HALL, for appellant.—The bill is without equity. There was no constitutional restriction upon the legislature passing the act removing the county site from Daphne to Bay Minette; and it is well settled, in the absence of such restriction, that the citizens of the county have no right to complain whether the county seat is located in one place or another; the legislative will being in this matter supreme.—Am. & Eng. Ency. Law (2d ed.), 1013; *Ex-parte Hill*, 40 Ala. 122. "A power to remove, like a power to locate, a county seat belongs primarily to the legislature; and in the absence of constitutional restrictions it may direct and remove whenever and to whatever place it may see fit."—7 Ency. Law (2d ed.), 1019. "The legislature may exercise the power to remove the county seat any way it may see fit."—7 Ency. Law (2d ed.), 1020.

Another reason why the bill is without equity is that the Board of Commissioners appointed by the act, and the Court of County Commissioners being by this act constituted a forum or court to decide and act in the matters conferred and enjoined upon them in the act, an injunction cannot be properly addressed to either of these forums.—16 Enc. of Law (2d ed.), 365; High on Injunctions, § 44; *Lynde v. County*, 16 Wallace, 13; *Colombo v. Eaves*, 92 U. S. 491.

[Hand *et al.* v. Stapleton *et al.*]

Another reason why the bill is without equity is that the court house at Bay Minette is the place where circuit court has been held for two sessions, and the public business transacted, and the probate court of said county has been held at that place since some time in October, 1901. In other words, Bay Minette is the *de facto* county seat of Baldwin County, and this the court *judicially knows*. 17 Ency. Law (2d ed.), 941, and numerous cases cited to support this proposition; 5 Saw. (U. S.) 237.

This being so the question whether Bay Minette is rightfully and legally the county seat cannot be raised collaterally, and can only be inquired into and determined in a direct proceeding instituted for that purpose. 7 Enc. Law (2d ed.), p. 1045; *Baker v. Board*, 40 Iowa, 226; *Robinson v. Moor*, 25 Ill. 135; *State v. Judge*, 43 La. Ann. 125; *Watts v. State*, 22 Texas App. 572; *Mayo v. Stoneum Ex.*, 2 Ala. 390; *Heath v. State*, 36 Ala. 273; *Lockhart v. City of Troy*, 48 Ala. 584; *Materson v. Mathews*, 60 Ala. 265; *Joseph v. Cauthorne*, 74 Ala. 415; *Cory v. State*, 76 Ala. 415; *Floyd v. State*, 79 Ala. 42.

GREGORY L. & H. T. SMITH, *contra.*—A resident and taxpayer may enjoin the illegal expenditure of county funds or the creation of illegal obligations.—*N. O. M. & C. R. R. v. Dunn*, 51 Ala. 134; *Allen v. Intendant & Council of Fayette*, 89 Ala. 643.

Statutory authority conferred upon a municipality must be strictly pursued; and when an act is authorized to be done upon a day named, it cannot lawfully be done on any other day.—*Whitman v. Karsner*, 20 Ala. 451; *Trammell v. Pennington*, 45 Ala. 682; *City of Eufaula v. McNab*, 67 Ala. 590; *Hawkins v. Board, etc.*, 50 Miss. 735. The plaintiffs as residents and taxpayers have a right to file such a bill.—*N. O. M. & C. R. R. v. Dunn*, 51 Ala. 134; *Allen v. Intendent and Council of Fayette*, 89 Ala. 643.

Is the act constitutional? Section 22, Art. 1, of Constitution of 1875, page 65, provides "that no power of suspending laws shall be exercised except by the General Assembly." This provision has not, so far as we

have observed, ever been pressed upon the attention of our courts or passed on, but its terms are brief and clear.   Under the provisions of section 10 of the act, the special commissioners can act, or not, as they please, and until they do act the law stands suspended.   They could have acted in February, 1901, or declined to have acted until May, and as the major part of the act did not go into effect until the special commissioners saw fit to act, they had the power to suspend its provisions for such time as pleased them.   They even had the power to altogether annul the law.   By section 5 they were authorized to award the contract to build the new court house on April 1, 1901, provided certain donations had at that time been made, but they were not authorized to make such contract on any other day.   The commissioners, therefore, had to contract for the court house on April 1, 1901, or not at all.—*Whitman v. Karsner,* 20 Ala. 451; *Trammell r. Pennington,* 45 Ala. 682; *Hawkins r. Board, etc.,* 50 Miss. 735.   As the doing of the acts which were made conditions precedent to making the contract on April 1, 1901, was left discretionary, and the contract had to be made on that day or not at all, and as there was no other provision for building the new court house and the act provided that the old court house continue to be the county seat until the new one was completed, the special commissioners could not only have suspended the law, but could have annulled it by simply failing to act prior to April 1, 1901.   In short, the act undertook to vest in certain named persons the power to remove the court house or not at their pleasure, and to suspend the act for such period as they saw fit not later than April 1, or to nullify it altogether. And certainly this is in direct violation of the constitutional provision quoted.

Section five provides when and how the cost of the new court house shall be ascertained, viz.:  By publishing for plans, specifications and contracts to build and that the lowest and best bid must be accepted.   The law rests no person with any discretion as to the character of the court house to be built or as to its costs, and the terms of the statute must be conformed to.—*Wightman r. Karsner,* 20 Ala. 451; *Trammell v. Pennington,* 45 Ala. 682; *Hawkins v. Board, etc.,* 50 Miss. 735; *City of*

*Eufaula v. McNab:* 67 Ala. 590. ·The result is· that, un-under section 10 of the act, section 5 does· not go into effect until the cost· of building the new court house and jail is ascertained, and yet that cannot be ascertained except under section 5, and until it does go into effect. In short; section 5 does not go into effect until the provisions of section 10 are complied with, and these provisions cannot· be complied with until section 5 goes into effect, and the act necessarily emasculates itself and become inoperative.

TYSON, J.—The bill in this cause is· filed by resident taxpayers of Baldwin county against the commissioners appointed by the act of the General Assembly approved February 5th, 1901, entitled "An act to provide for the removal of the county seat of Baldwin county, Alabama, from Daphne in said county to Bay Minette in said county" (Acts, 1900-1901, p. 754), the judge of probate and the treasurer of the county. The object sought to be accomplished is to have the acts above referred to declared invalid because unconstitutional and inoperative, and to restrain the payments of money out of· the county treasury for the removal of the court house.

It is urged that the act is unconstitutional because it violates section 22, Art. I of the constitution of 1875, which provided "That no power of suspending laws shall be exercised except by the General Assembly."

The first section of the act purports to unconditionally remove the county site from Daphne to Bay Minnette; the second names the individuals who are to compose the board of commissioners to carry the provisions of the act into effect; the third authorizes them to receive and collect subscriptions to any fund that may be donated to the county for the purpose of building a court house and jail at Bay Minette; the fourth authorizes them to sell the court house and jail and the real estate owned by the county at Daphne and to· place the proceeds arising therefrom in the county treasury to aid in building a court house and jail at Bay Minnette;

the fifth requires the commissioners after they shall have secured solvent subscriptions to the extent of three thousand dollars and a donation of a proper site in fee at Bay Minette, to advertise for plans and specifications; the building of the court house and jail to be completed within eight months from the first day of April, 1901, and to award the contract for the construction of the buildings to the best and lowest bidder.   The sixth section requires the commissioners' court of the county, at its February term, to ascertain and certify to the commissioners, appointed by the act, what amount of money the county can contribute during the year 1901 to the building of the court house and jail at Bay Minette without increasing the tax rate of the county; the seventh prescribes the mode by which the cost of the buildings and the expense of moving the records, furniture, etc., from Daphne to Bay Minette are to be paid, etc., etc.; the eighth makes it the duty of the county officers to move the records, furniture, etc., to Bay Minette within thirty days after the completion of the court house and jail; the ninth provides that until the court house and jail are built the courts of the county shall be held and the public business of the county shall be transacted at Daphne.   We quote the tenth section literally.   It is: "That except to qualify as such commissioners, to secure subscriptions for the purpose herein provided, to ascertain what can be realized from the sale of the court house and jail and the real estate owned by the county of Baldwin at Daphne, this act shall not take effect until ascertained by said board of commissioners that the amount to be paid by said county for building said court house and jail at Bay Minette in addition to the solvent donations secured and the amount that can be realized from the sale of the court house and jail and the real estate owned by said county at Daphne, will not require an increase of the present tax rate of said county to pay the same."

We think it is entirely clear, when we view the whole act, that it was the intention of the legislature that the court house and jail was only to be removed in the event

11

they could be built at Bay Minette upon a lot to be donated, out of the subscriptions, proceeds arising from the sale of the property owned by the county at Daphne and such sum of money as the county could appropriate during the year 1901 without increasing the tax rate for that year. While it is true, as we have said, the first section of the act provides for the unconditional removal of the county seat, the tenth makes the removal conditional and must control. The rule is, as between conflicting sections of the same act, the last in the order of arrangement will control.—33 Am. & Eng. Ency. Law (1st ed.), pp. 310, 311; Endlich on Interpretation of Stat., § 133. Contingent legislation is not of infrequent occurrence. Many statutes are enacted to become operative upon the happening of some future event and a number of such statutes have been reviewed by the courts and held to be constitutional. The rule is stated generally in 6 Am. & Eng. Ency. Law (2d ed.), p. 1031, to be, "Where an act is clothed with all the forms of law and is complete in and of itself, it is fairly within the scope of the legislative power to prescribe that it shall become operative only upon the happening of some specified contingency."

In *Lothrop v. Stedman*, 42 Conn. 583, one of the questions presented was whether a statute, repealing a charter, at a certain date, provided that if the company shall make up a deficiency in its assets before that date the charter shall remain in full force, and appointing a special tribunal to determine whether the definciency is made up, was constitutional. The court said: "The resolution [statute] provides that the charter shall be repealed on September 1st, 1875; provided that if the company shall, before that day, receive a certificate that the deficiency in its assets has been supplied, then the charter shall remain in full force; and in case of a disagreement between the commissioner and the company as to the amount of its assets, the Chief Justice and his associate shall determine and state the amount to be paid in, and if the amount so found shall be paid within

thirty days, the resolution [statute] shall be inoperative and void. I am inclined to the opinion that, by this resolution [statute], the charter was repealed, but the repeal was not to take effect or be operative, if a specified event should thereafter take place, which event was uncertain. The Commissioner, subject to an appeal to the Chief Justice and a judge of the Superior Court, was to determine whether that event had taken place. The legislature, for itself, determined and enacted that the charter should be repealed, provided an event did not occur in the future; the ascertainment and announcement that the event had happened the legislature entrusted to an officer or a committee whom it designated. The legislature delegated to no one the power to determine whether the charter should or should not be repealed. It delegated the duty of ascertaining whether a fact existed, upon the existence of which it had determined that the repeal should not go into effect. A valid statute may be passed to take effect upon the happening of some future event. Certain, or uncertain, it is a law *in presenti* to take effect *in futuro*. The event, or change of circumstances, must be such as, in the judgment of the legislature, affects the expediency of the law. The legislature in effect declares the law inexpedient if the event should not happen, expedient if it should happen. They appeal to nobody to judge of its expediency."

In *State v. Parker*, 26 Vt. 357, the defendant was inditted for the violation of a liquor law. The statute which was offended, provided that it was to go into effect on the second Tuesday of March, 1853; with the proviso that the meetings of the freemen of the State should be holden on the second Tuesday of February, 1853, to vote upon "their judgment and choice in regard to this act," and "if a majority of the ballots cast shall be 'no,' this act shall take effect in December, 1853." The vote was "yes" and the offense was committed before December. It was argued that the fixing of the time at which an act shall take effect is properly and exclusively within the province of legislative power as is the enactment of any other provision of a law,

and the expediency of enacting any part of the whole of this law would as legitimately have been submitted to the decision of the people as would the section, which prescribes the time for the commencement of its operation. That this time was not definitely fixed by the legislature, but that body referred it to the people to determine whether the act should be law for and during the time from the second Tuesday of March, to the first Monday of December, 1853. For these reasons, the insistence was that the act was uncon: stitutional. The court, after a careful examination of the cases, held otherwise; sustaining its constitutionality upon the ground that no power to suspend the statute was delegated to the people and the act of suspension was by the legislature itself. We quote a portion of the opinion which was delivered by REDFIELD, Chief Justice: "It cannot be said with any show of fairness that the legislature did not enact the law and fully pass upon all questions of constitutionality or expediency involved in the subject. And it is admitted on all hands that the legislature may enact laws, the operation or suspension of which shall be made to depend upon a contingency. This could not be questioned with any show of reason or sound logic. It has been practiced in all free states for hundreds of years, and no one has been lynx-eyed enough to discover, or bold enough to declare, that such legislation was on that account void or irregular."

In *Locke's Appeal*, 72 Pa. St. 491, 498, it was declared that "to assert that a law is less than a law because it is made to depend on a future event or act, is to rob the legislature of the power to act wisely for the public welfare, whenever a law is passed relating to a state of affairs not yet developed, or to things future, and impossible to be fully known;" and it was said that the proper distinction is this: "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend."

In *Home Insurance Co. v. Swigert*, 104 Ill. 665, it is said: "Nothing is better settled than that the operation

and even remedial character of a perfect and complete law may, by virtue of limitations contained in the law itself, based upon contingent extrinsic matters, be enlarged, diminished, or wholly defeated. Such laws, though adopted absolutely and perfect in all their parts, yet by their own limitations, they are applicable to a hypothetical condition of things only, and which may or may not even happen. That it is perfectly competent to pass such laws is shown by long legislative experience, and a decided weight of judicial authority. Indeed, we have not the slightest doubt of the validity of laws of this character, and to hold otherwise would clearly lead to the most serious consequences."

In *Mayor and City Council of Baltimore v. Clunet et al.*, 23 Md. 449, the fifth section of an ordinance provided that it should not take effect until certain *mandamus* cases, then pending, shall have been dismissed and other cases against the city released and abandoned; and further required the assent of certain persons named to the provision of the 4th section as a condition precedent to the ordinance going into effect. The court said: "This is not delegating to others, the discretion vested by law in the mayor and city council. A valid law may be passed, to take effect upon the happening of a future contingent event, even where that event involves the assent to its provisions by other parties. * * * The same principle applies to an ordinance passed by a municipal corporation, provided the subject matter of the ordinance is within the legislative powers delegated to the corporation. * * * The same observation will apply to the other contingencies mentioned in the 5th section."

In *Field v. Clark*, 143 U. S. 649, one of the questions presented was whether the authority conferred upon the President by section 3 of the act of Congress of October 1, 1890, to suspend by proclamation the free introduction of sugar, molasses, coffee, tea and hides when he is satisfied that any country producing such articles imposes duties or other exactions upon the agricultural or other products of the United States, is open to the objection that it unconstitutionally transferred legislative

power to the President. The court in part said: "As the suspension was absolutely required when the President ascertained the existence of a particular fact, it cannot be said that in ascertaining that fact and issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws. Legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency. What the President was required to do was simply in execution of the act of Congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect. It was a part of the law itself as it left the hands of Congress that the provisions, full and complete in themselves, permitting the free introduction of sugars, molasses, coffee, tea and hides, from particular countries, should be suspended, in a given contingency and that in case of such suspension, certain duties should be imposed."

We could indulge in quotations from other cases where the constitutionality of contingent legislation has been sustained by the courts; but these will suffice. However, we cite as sustaining the right of the legislature to enact such statutes the following cases: *Bull v. Read,* 11 Gratt. 78; *Peck v. Meddell,* 17 Ohio St. 271; *Walton v. Greenwood,* 60 Maine 356; *The State v. O'Neill,* 24 Wis. 149; *Alcorn v. Homer,* 38 Miss. 652; *The People v. Reynolds,* 5 Gilman 1; *The People v. Solomon,* 51 Ill. 37; *The State v. Hunter,* 38 Kan. 578; *St. Louis Consolidated Coal Co. v. Illinois,* 185 U. S. 203.

This character of legislation has been recognized by this court as valid and constitutional in the cases of *Stein v. The Mayor, etc., of Mobile,* 24 Ala. 591; *Clarke v. Jack.* 60 Ala. 271; *Ex parte Hill,* 40 Ala. 121; *State v. Crook,* 126 Ala. 600; *Jackson v. The State,* 131 Ala. 21. In *Stein's case, supra,* it was contended that there was a delegation of legislative power to the people by allowing the city of Mobile to levy the tax, provided three-fifths of the taxable inhabitants shall vote in favor of it. The court, while holding the act to be constitutional, further held that there was no delegation of legislative power. It is evident from reading the opinion that

the consideration upon which this conclusion was
reached was upon the principle announced in the quo-
tation from the cases above, that the act was complete in
itself when it left the hands of the legislature, and that
that body determined the expediency of its going or not
going into effect. In *Jackson's case* the point was ex-
pressly ruled.

We have but to apply these principles to the act un-
der consideration to see that it is not subject to the ob-
jection of unconstitutionality urged against it. The
legislature determined for itself that the act should not
take effect until it was ascertained by the board of com-
missioners that the amount to be paid by the county
for building the court house and jail would not require
an increase in the tax rate of the county—a limitation
expressly declared in the act itself. The only matter
referred to the commissioners was to ascertain the fact
that the amount of money to be paid by the county
could be done without requiring an increase in the tax
rate. Upon the ascertainment of the fact that the money
to be paid by the county could be paid without an in-
crease of the tax rate, the act goes into operation. On
the other hand, if the fact be ascertained that the
county could contribute nothing without an increase
of the tax rate, the act by its very terms was defeated.
Whatever suspension there was of the act until the com-
missioners could determine the question of fact sub-
mitted to them, it was exercised by the legislature and
not by the commissioners.

The next insistence going to an alleged infirmity of
the act is that its provisions are irreconcilably conflict-
ing, and for that reason it is inoperative. This insist-
ence is based upon the theory that sections five and six
of the act impose certain mandatory duties upon the
court house commissioners and the commissioners'
court of the county which must necessarily be per-
formed, before the court house commissioners could de-
termine the contingency specified in the tenth section
upon which the act was to go into effect. This construc-
tion of the act may be conceded and yet, under the prin-
ciples declared above, that "as between conflicting sec-

tions of the same act, the last in order of arrangement will control," it would afford no ground for striking down and nullifying the entire enactment. Especially is this true, as here, where the intention of the legislature and its real purposes can be effectuated by giving effect to the later section and others that are in harmony with it. We do not think it can be gainsaid that it was the general purpose of the legislature to authorize the building of the court house and jail at Bay Minette provided it could be done without increasing the tax rate of the county, and that a determination of that question was left to the court house commissioners. Leaving out of view section six, ample provision is made by section seven, which is in perfect harmony with section ten, to protect against any increase in the tax rate, and is a sufficient authorization to the board of county commissioners to allow and order paid out of any money in the county treasury, the cost of building of the court house and jail, or any money that may go into the treasury by taxation, without increasing the tax rate.

The demurrer to the bill assigns many grounds, a number of them raising the questions we have discussed. These should have been sustained.

Reversed and remanded.