LODGE 1858, AMERICAN FEDERA-
TION OF GOVERNMENT
EMPLOYEES, et al.

v.

James E. WEBB, Administrator, National
Aeronautics and Space Administration,
et al., Appellants.

LODGE 1858, AMERICAN FEDERA-
TION OF GOVERNMENT
EMPLOYEES, et al.

v.

James E. WEBB, Administrator, National
Aeronautics and Space
Administration, et al.

Appeal of NATIONAL COUNCIL OF
TECHNICAL SERVICE
INDUSTRIES.

Nos. 76–1821, 76–1934.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 21, 1977.

Decided March 20, 1978.

Rehearing Denied April 19, 1978.

Gil Zimmerman, Special Atty., Dept. of Justice, Washington, D.C., for appellants in No. 76–1821.

Rex E. Lee, Asst. Atty. Gen., and Irving Jaffe, Deputy Asst. Atty. Gen., Washington, D.C., were on the brief for appellants in No. 76–1821.

Ronald R. Glancz and Harry R. Silver, Attys., Dept. of Justice, Washington, D.C., also entered appearances for appellants in No. 76–1821.

James F. Fitzpatrick, Washington, D.C., with whom Stephen M. Sacks, Washington, D.C., was on the brief, for appellant in No. 76–1934, also entered appearances for appellee, National Council of Technical Service Industries in No. 76–1821.

Edward L. Merrigan, Washington, D.C., for appellees.

Before Mr. Justice CLARK,* of the Supreme Court of the United States, and MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

A reduction-in-force (RIF) was announced at the Marshall Space Flight Center in Huntsville, Alabama (Marshall and MSFC), on December 6, 1967.[1] 764 federal government employees were originally affected, though this was later reduced to only 166. The RIF procedure[2] requires that employees be laid off only if they cannot be placed in alternative available positions for which they are qualified at Marshall. NASA utilized the services of both government employees and independent technical service contractors who in turn hired their own employees (contractor employees).[3]

Appellants here are several former individual employees of Marshall, who have been displaced by the RIF, and the union.[4] Their complaint, in its most essential terms,

---

* Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a). Mr. Justice Clark heard oral argument in this case but subsequently died and did not participate in the final decision.

1. The amount of money involved in this case is substantial. In the fall of 1967, immediately prior to the RIF which prompted this litigation, the Marshall Center utilized 8,218 support contractor employees and 7,086 permanent Civil Service employees. There were 12 principal contractors which received from NASA approximately $70 million each year for the support services. J.A. 1209–10. By 1968, it was estimated that the Federal Government had

contracted for $8.5 billion of such services. Govt. Br. at 8.

2. See 5 C.F.R. § 351 (1977).

3. The subjects of the contracts at Marshall ranged from routine maintenance to sophisticated technical laboratory assistance.

4. The standing of those employees, and of the union, to bring suit has already been considered and upheld on an earlier appeal of this case. Lodge 1858, AFGE v. Paine, 141 U.S. App.D.C. 152, 436 F.2d 882 (1970). See text at —— of 188 U.S.App.D.C., at 500 of 580 F.2d infra.

is that NASA was employing many technical service workers at Marshall supposedly as independent contractors, but actually with a degree of control by NASA and with other characteristics that made them functionally employees of the United States. It is alleged that such an arrangement would violate the Civil Service laws,[5] and that if they were actually employees of the United States, the arrangement would allegedly also violate NASA's own statute,[6] and its collective bargaining agreement. If the contracts with the independent technical services contractors which are here in question, were, for these reasons, illegal, appellants contend that they should then be set aside and that civil service employees, rather than being terminated by the RIF, should be permitted to take over the positions filled under the agreements with the contractors.

## I

The case has a long litigational history. The complaint was filed in 1967, and dismissed by the district court on April 24, 1968 for failure to exhaust administrative remedies. We vacated the dismissal and remanded the case on April 21, 1970.[7] On November 30, 1973, the district court granted partial summary judgment in the re-

manded cause, ruling that if any of the workers employed pursuant to the independent contracts were functionally employees, the plaintiffs would have relief. In an exercise of the discretionary doctrine of primary jurisdiction, the district court held the proceedings in abeyance for 60 days, during which the

> matter [was] . . . referred to the United States Civil Service Commission with directions to apply the "Pellerzi Standards" and determine whether the relationship of "employer-employee" existed on December 6, 1967, and exists at the present time between National Aeronautics and Space Administration and the contractor non-civil service employees involved in this case . . .

(J.A. 409).

The "Pellerzi Standards," referenced in the trial judge's order, figure importantly in this appeal. In October of 1967, General Counsel Pellerzi of the U.S. Civil Service Commission issued an opinion concerning the legality of certain contracts at the Goddard Space Flight Center.[8] That opinion set forth six specific criteria for determining whether the individuals furnished by the independent contractors were employees of the contractors or of the United States.[9] If all six criteria were present, an

---

**5.** U.S.C. § 3502 (1970) specifies the order of retention of "employees" during a RIF. If the contractors' employees were actually employees of the federal government, they would have to be melded into the tenure roster, with the result that fewer of the plaintiffs would be dismissed.

**6.** 42 U.S.C. § 2473(b)(2) (1970) provides:
  In the performance of its functions the Administration is authorized . . . to appoint and fix the compensation of such officers and employees as may be necessary to carry out such functions. Such officers and employees shall be appointed in accordance with the civil-service laws . . . .
  See text at —— of 188 U.S.App.D.C., at 499 of 580 F.2d *infra*.

**7.** *Lodge 1858, AFGE, supra* note 4. Exhaustion of administrative remedies had occurred just prior to oral argument.

**8.** J.A. 295.

**9.** Accordingly, contracts which, when realistically viewed, contain all the following ele-

ments, each to any substantial degree, either in the terms of the contract, or in its performance, constitute the procurement of personal services proscribed by the personnel laws.

  —Performance on-site
  —Principal tools and equipment furnished by the Government
  —Services are applied directly to integral effort of agencies or an organizational subpart in furtherance of assigned function or mission
  —Comparable services, meeting comparable needs, are performed in the same or similar agencies using civil service personnel
  —The need for the type of service provided can reasonably be expected to last beyond one year
  —The inherent nature of the service, or the manner in which it is provided reasonably requires directly or indirectly, Government direction or supervision of contractor employees in order:
  —To adequately protect the Government's interest or

arrangement that had been considered an independent contract should instead, in the Commission's view, be treated as employment.

On December 21, 1973, the district court clarified its order to the Civil Service Commission. At issue was a supplement to the Pellerzi opinion that had been prepared by the successor General Counsel Mondello of the U.S. Civil Service Commission (J.A. 1512). The court instructed that "the Mondello Supplement . . . did not add any new or different standards or cancel or delete any of the 'Pellerzi Standards' but reaffirmed them and supplied the classification thereof" (J.A. 442).

The U.S. Attorney had submitted instructions to the United States Civil Service Commission as to the correct standard to use, but the district court in an order of April 2, 1974 refused to approve those instructions. On May 30, 1974, the Civil Service Commission issued its report on the Marshall contracts.

The Commission's report was thorough and exhaustive.[10] It reached the conclusion that none of the contracts involved in this case were impermissible. The district court, after reviewing the Commission's report, disagreed. Thirty-two contracts are involved in this case; the court held that twenty-two of them were invalid, two more were partially invalid, and eight were permissible (J.A. 434–35). The Administrator of NASA and the intervenor National Council of Technical Service Industries brought this appeal.

## II

██ Appellants reiterate their objections to plaintiffs' standing, but these matters have already been settled on previous appeal.[11] In brief recapitulation, the plaintiffs here, and their union, would benefit from a voiding of the allegedly impermissible contracts. There would be substantial

—To retain control of the function involved, or
—To retain full personal responsibility for the function supported in a duly authorized Federal officer or employee.

retroactive benefits and substantial future benefits except in the rare case that NASA immediately abolished all of the jobs the contractors were filling, or immediately provided for legitimate contracts to cover them. These possibilities are not so likely of realization, however, as to make the relief sought by plaintiffs purely speculative within the meaning of *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Furthermore, the statutes and regulations protecting rights of federal civil service employees constitute a "pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class in a particular regard" within the meaning of *Cort v. Ash*, 422 U.S. 66, 82, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). And permitting a private cause of action to prevent abuses of that legislative scheme would not interfere with the statutory purpose or with concerns of federalism. *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. 2080.

## III

Accordingly, we turn to the merits of the appeal. The basic question presented is whether the support service contracts in effect at the Marshall Space Flight Center violate the personnel procurement restrictions of the NASA enabling act as set forth in 42 U.S.C. § 2473(b)(2) or whether they fall within the range of the broad contracting authority granted to NASA by 42 U.S.C. § 2437(b)(5).

Subsection (b)(2) of the act provides as follows:

(b) In the performance of its functions the Administration is authorized—

\* \* \* \* \* \*

(2) *to appoint* and fix the compensation of such officers and *employees* as may be necessary to carry out such functions [listed in subsection (a)]. Such officers

(J.A. 352–53).

10. It is reproduced in the joint appendix at pages 504–1156.

11. *Lodge 1858, AFGE, supra* note 4.

and *employees* shall be *appointed in accordance with the civil service laws* and their compensation fixed in accordance with chapter 51 and subchapter III of chapter 53 of Title 5, *except* that (A) to the extent the Administrator deems such action necessary to the discharge of his responsibilities, he may appoint not more than four hundred and twenty-five of the scientific, engineering, and administrative personnel of the Administration without regard to such laws . . .

(Emphasis added). This section states only that *NASA's employees* shall be covered by the civil service and compensation laws, except that 425 NASA *employees* can be appointed without regard to those laws. The exception was intended to enable NASA to recruit qualified scientists, engineers, and other personnel on a prompt basis without regard to civil service limitations.[12]

Subsection (b)(5) specifically concerns support service contracting, which is the focus of appellee's challenge. That section provides:

In the performance of its functions [under the National Space Program] the Administrator [NASA] is authorized—

. . . . .

(5) without regard to section 529 of Title 31, to enter into and perform such *contracts*, leases, cooperative agreements, or *other transactions* as may be necessary in the conduct of its work and on such terms as it may deem appropriate, with any agency or instrumentality of the United States, or with any State, Territory, or possession, or with any political subdivision thereof, or with *any person, firm, association, corporation,* or educational institution. To the maximum extent practicable and consistent with the accomplishment of the purpose of this chapter, such contracts, leases, agreements,

and other transactions shall be allocated by the Administrator in a manner which will enable small-business concerns to participate equitably and proportionately in the conduct of the work of the Administration . . . . .

42 U.S.C. § 2473(b)(5) (emphasis added). This section embodied the American response to the shattering effect that the Soviet's Sputnik had on our international stature in the post-World War II era. Congress reported that there was a need to catch and overtake the Soviets by having NASA command the resources of the nation in a super effort to accelerate our space effort; the specter of Soviet superiority in an area with strong security overtones was unacceptable.[13] The section epitomizes the Congressional intent to grant NASA the necessary authority and discretion to mount the gargantuan effort. In explaining its intent with respect to this broad grant of power, the House Report stated:

Paragraph (5) gives the Administrator *broad authority* to enter into and perform *contracts*, leases, agreements, and other transactions, *on such terms* and for such periods *as he deems appropriate*, with *any* public or private *agency, firm*, educational institution, or other *person*. [emphasis added.][14]

Indeed, Congress expected that NASA would invoke the participation of private industry and of educational institutions in embarking on the nation's space effort. On June 2, 1958, during House consideration of the act, Speaker McCormack, Chairman of the House Select Committee on Astronautics and Space Exploration, emphasized that NASA's growth would occur principally through contracts with industry and not through the addition to civil service personnel:

---

12. H.R.Rep. No. 1770, 85th Cong., 2d Sess., 1958 U.S.Code Cong. & Admin.News, p. 3178.

13. *Id.*, at 3160, 3161–64; 42 *U.S.C.* § 2451(b).

14. *Id.*, at 3178. Another indication of how broad Congress meant NASA's contract authority under subsection (b)(5) to be is dis-

cussed by the following statement in the House Report:

The . . . authority to make grants without limitation, conferred in the previous bill, has been eliminated as unnecessary in view of [the Administrator's] broad contract and lease authority. . . .
*Id.*, at 3169.

According to NA[S]A witnesses, *the contemplated expansion of functions under the new agency will take place largely by means of contract work rather than through research conducted by the agency itself.* At present, the NA[S]A employs approximately 8,000 people. The NA[S]A witnesses estimated that the increase in agency personnel would not be more than several hundred. Even with considerable allowance for error in their estimate, *it seems likely that the number of new Federal employees in the near future will be relatively small.* In other words, the full benefit of this expending [*sic*] program *will accrue to private enterprise.*"

104 Cong.Rec. 9918 (1958) (emphasis added). These remarks had obvious reference to the practices authorized by Subsection (b)(5) and it is the execution of the very policies referred to in Speaker McCormack's speech that Lodge 1858 claims violates the statute.

At the same time that Congress enacted the enabling act which compelled NASA to produce a mammoth space effort, "the number of civil service personnel that could be hired was limited due to personnel ceilings imposed within the Federal Civil Service." Thus, it is not surprising that "support service contracts [were] a way of life at Marshall Space Flight Center from its beginning [in 1960]." [15]

Because of this background, the personnel ceilings on civil service employees, the urgency for the program as expressed by Congress, and the broad contracting authority given to the Administrator, including the direction to favor small business, "NASA and MSFC officials apparently believed they had a mandate in the law to develop a Government/Industry/Education Space team." [16] The result was that NASA and Marshall resorted to support service contracts as the alternative means of overcoming the civil service personnel ceilings.[17] This practice was regularly disclosed to Congress in its budget requests [18] and the resulting appropriations based thereon are an indication of congressional approval.[19] If anything more were needed to approve the practice of using extensive support service contracts, it came in 1971 and 1972 when Congress directed reductions in NASA's *civil service* work force at the same time that it continued to approve its budget requests for funds to meet its obligations under its support service contracts that were in existence.[20]

---

**15.** Summary Report, U.S. Civil Service Commission, May, 1974, J.A. 510.

**16.** *Id.*, at J.A. 510.

**17.** *Id.*

**18.** In 1970 and 1971, Congress approved budgets for NASA based on the long-standing NASA interpretation of the Space Act. Hearings before the Subcommittee on Manned Space Flight on H.R.4046 and H.R.10251 (Fiscal Year 1970 Authorization Act), House Committee on Space and Astronautics, 91st Cong., 1st Sess. 502 (1969).

**19.** *Kay v. Federal Communications Commission*, 143 U.S.App.D.C. 223, 231–32, 443 F.2d 638, 646–47, and cases cited n.32 (1970).

**20.** Employment trends and Congressional fiscal authorizations after the Marshall RIF show that Congress mandated additional reduction in civil service employees at NASA, without imposing similar reductions and restrictions on support service contracts. Civil service employment at NASA in the years 1970, 1971, and 1972 was 32,548, 30,506, and 28,382 employees respectively. United States Department of Commerce, Bureau of the Census, Statistical Abstract of the United States, No. 389, at 236 (1974). At the same time, Congress *increased* fiscal authorizations for support service contracting. Support service contracts were authorized to be paid under the "research and program management" appropriation by the authorization acts. *E. g.*, NASA Authorization Act of 1971, Pub.L. No. 91–303, § 1(e), 84 Stat. 368 (1970). The 1971 Act appropriated $683 million for research and program management, of which $506 million was available for personnel and related costs (NASA Authorization Act of 1971, Pub.L. No. 91–303, § 1(c), 84 Stat. 368 (1970)); the 1972 Act appropriated $693 million for research and program management, of which $530 million was available for personnel and related costs (NASA Authorization Act of 1972, Pub.L. No. 92–68, § 1(c), 85 Stat. 174 (1971); and the 1973 Act appropriated $729 million for research and program management, of which $572 million was available for personnel and related costs (NASA Authorization Act of 1973, Pub.L. No. 92–304, § 1(c), 86 Stat. 157 (1972).

■ Appellee contends that "NASA was to perform all its statutory functions under the 1958 Act with [quoting subsection (b)(2)] *'employees appointed in accordance with the civil service laws.'*" According to appellee, the only exceptions to this rule are the 425 employees described in the statute itself (Br. at 37–38). This argument completely disregards the significance of subsection (b)(5) which follows and bears directly upon support service contracting. As already discussed, the employees of these contractors are not *appointed employees* within the meaning of subsection (b)(2). Subsection (b)(5) is more than an exception to subsection (b)(2); it covers a different situation altogether. Appellee cites numerous passages for legislative history all stating that NASA employees shall be appointed in accordance with the civil service laws. Appellee's use of these passages does not account for the difference between employees of contractors under subsection (b)(5) and employees of the United States appointed under subsection (b)(2).

Appellee further argues that subsection (b)(5) is not a license to evade and circumvent subsection (b)(2) (Br. at 44). This begs the question: unless NASA treats the employees of the contractors as subsection (b)(2) appointed employees, subsection (b)(5) is not being used to circumvent subsection (b)(2). Nothing in 31 U.S.C. §§ 665(a), 665(b) is to the contrary: those sections provide that no officer or employee of the United States shall employ personal service or involve the Government in contracts or other obligations beyond the authority of law. Subsection (b)(5) authorizes support services contracts, and Title 31 is not violated so long as the contractor's employees are not treated as employees within the meaning of the civil service laws. In this regard, appellee states:

No federal agency, including NASA, may award its regular work functions to non-Civil Service employees, through the use of corporate intermediaries, contracts or any other device, without first obtaining specific statutory authority from Congress to exclude such work from the federal classified Civil Service.

Br. at 53 (emphasis omitted). This statement goes much too far. Congress gave NASA a specific, giant task in need of quick fulfillment and broad power to enter into *contracts* as necessary for the performance of its work on such terms as the Administrator thought appropriate. This was specific statutory authority. It is true that NASA cannot treat the employees as its own; otherwise, the employees would be required to be appointed under subsection (b)(2). This brings us to the question whether the contractor's employees were responsible to the contractor or NASA under the standards we find relevant to that determination. Appellee's argument here sheds little light on the basic issue.[21]

Appellee also argues that "regular civilian work functions" cannot be the subject of support services contracts under subsection (b)(5). Yet appellee does not challenge the district court's decision that eight of the contracts covering, *inter alia*, security, fire protection, medical services, food services, custodial services, and logistic support were *valid subjects of support arrangements.* J.A. 495, 497. This not only belies appellee's argument, but also demonstrates that the crucial question in this case is not merely what functions the contractors performed but whether NASA treated the other questioned contractor's employees as its own employees.

**21.** In the same vein, appellee makes this statement in its brief:

Before leaving this point, the Court might be interested in why Congress has always gone to such lengths to make it clear that, *absent a specific statutory exception,* all work in the Executive Branch must be performed by the Civil Service.

Br. at 55 (emphasis original). Appellee's premise underlying this statement—that contractors under subsection (b)(5) cannot do work in the Executive Branch—would effectively read subsection (b)(5) out of the act. Our concern is not the Executive Branch generally but NASA specifically and that necessarily involves any specific authority conferred on NASA that is not conferred generally on the Executive Branch.

That NASA was authorized to enter into support service contracts by the Act is beyond serious dispute. Subsection (b)(5) gave NASA broad power to contract for support services. The narrower question is whether the contracts validly entered into under subsection (b)(5) were improperly administered so as to treat the contractor's employees as subsection (b)(2) employees which were required to be appointed in accordance with the civil service laws.

The statute most basic to this narrower question is 5 U.S.C. § 2105(a) (1970), which relates to the Civil Service, and defines "employee" restrictively as follows:

> For the purpose of this title, "employee", except as otherwise provided by this section or when specifically modified, means an officer and an individual who is—
>
> (1) appointed in the civil service by one of the following acting in an official capacity—
>
> (A) the President;
>
> (B) a Member or Members of Congress, or the Congress;
>
> (C) a member of a uniformed service;
>
> (D) an individual who is an employee under this section;
>
> (E) the head of a Government controlled corporation; or
>
> (F) the adjutants general . . . .
>
> (2) engaged in the performance of a Federal function under authority of law or an Executive act; and

> (3) subject to the *supervision* of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position.

(Emphasis added.) All three of the statute's subsections must be satisfied for an individual to be deemed an "employee" within the meaning of the Civil Service laws.

■ It is critical to observe that of the six Pellerzi criteria,[22] only one overlaps with the statute for determining whether a person is an "employee" of the United States, and that is the necessity for *supervision* (Pellerzi criterion 6; statute provision 3). "Supervision" is a criterion that in importance far exceeds the others. As used in this context, supervision means control of the individual workman's physical conduct, *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974), not just oversight; "control [of] the individual in the *performance* of his work and [of] the *manner* in which the work is done . . . is *usually decisive.*" Pellerzi Opinion (J.A. 447) (emphasis added). Employees are distinguished from independent contractors most basically by the detail with which the party for whom the work is eventually produced actually supervises the manner and means by which the work is performed; and *degree of control* or *supervision* is the principal element that differentiates employees and independent contractors at common law,[23] in the state statutory context,[24] and in the context of other federal

---

**22.** *See* note 9 *supra.*

**23.** Restatement (Second) of Agency § 2 (1957) states:

(2) A servant [more recently termed "employee"] is an agent employed by a master to perform service in his affairs whose *physical conduct in the performance of the service is controlled* or is subject to the right to control by the master.

(3) An independent contractor is a person who contracts to work with another to do something for him *but who is not controlled* by the other nor subject to the other's right to control *with respect to his physical conduct in the performance of the undertaking.* (Emphasis added).

Section 220(2) states:

In determining whether one acting for another is a servant or an independent contractor, the

following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the *details* of the work . . . . (Emphasis added).

**24.** For example, state unemployment compensation acts define "employee" so as to exclude those persons in an independent contractor relationship with the hiring party. *See, e. g.,* Va.Code § 60.1–14(6) (Supp.1976):

Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless:

(a) Such individual has been and will continue to be *free from control or direction over the performance of such services*, both under his contract of service and in fact; *and*

statutes as well.[25] All this is another way of saying that the practice of giving an order for a specific service or article, with the right to reject the finished product or result, is not the type of supervision or control that converts an individual who is otherwise an independent contractor (such as an employee of a contractor) into an employee.

The situation here involves NASA entering into written contracts with various companies to perform special services. In each contract, NASA looked to the company that hired the individuals to perform certain tasks. However, the individual companies, not NASA, were to furnish the necessary management and personnel. It was the responsibility of each company to supervise, control, and direct the performance of its own employees in fulfilling the contract's requirements. These contracts required the

companies to exercise their independent judgment. This is the classic independent contractor relationship.

In actual operation, in those instances which come closest to the employee border-line, NASA generally gave specific orders, usually to the company supervisor, for certain articles and services. "[T]he *contractor* [not his employees] were told what to do, when to do it, how it was to be done, the qualification requirements for his key people, how and when to report on his activities, etc." (J.A. 454). But the control over the performance of such requests and the responsibility for the manner in which they would be carried out was in the contracting party and its supervisors. Thus, the specificity of the requests did not transcend the fact that the actual on-the-spot supervision employed to produce compliance was carried out by the contracting company and

---

(b) Such service is either outside the usual course of the business for which such service is performed, or such service is performed outside of all the places of business *of the enterprise for which such service is* performed; or such individual, in the performance of such service, is engaged in an independently established trade, occupation, profession or business.

(Emphasis added.)

Md.Ann.Code art. 95A, § 20(g)(6)(i)–(iii) (Supp. 1976):

Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this article, irrespective of whether the common-law relationship of master and servant exists, unless and until it is shown to the satisfaction of the Executive Director that:

(i) That individual has been and will continue to be *free from control or direction over the performance of those services,* both under his contract of service and in fact; *and*

(ii) The service is either outside the usual course of *business for which that service* is performed, or that the service is performed outside of all the places of business of the enterprise for which the service is performed; *and*

(iii) The *individual is customarily engaged in* an independently established trade, occupation, profession or business of the same nature as that involved in the service in question . . . . .

(Emphasis added). Degree of control and direction are crucial factors for differentiating employees and independent contractors in these state statutory schemes. Under these

tests the individual workers were employees of the independent service contractors.

25. The Labor Management Relations Act of 1947 defines "employees," specifying that the term is not to include "any individual having the status of an independent contractor." 29 U.S.C. § 152(3) (1970). The "obvious purpose" of the 1947 amendment to the Wagner Act which explicitly excluded independent contractors from the definition of employee "was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act." *NLRB v. United Insurance Co.,* 390 U.S. 254, 256, 88 S.Ct. 988, 989, 19 L.Ed.2d 1083 (1968). *See also Brown v. NLRB,* 462 F.2d 699 (9th Cir.), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972); *NLRB v. Lindsay Newspapers, Inc.,* 315 F.2d 709 (5th Cir. 1963). The emphasis placed by general agency principles on the degree and nature of supervision has been noted in note 23, *supra.*

Circuit Courts of Appeals, in construing the labor act, have laid stress on the degree of supervision being exercised. *See, e. g., Carnation Co. v. NLRB,* 429 F.2d 1130, 1134 (9th Cir. 1970) (despite provisions for economic sanctions, the fact that "there is no attempt to supervise the details of the work" bars employee status); *NLRB v. A.S. Abell Co.,* 327 F.2d 1, 3 (4th Cir. 1964): "[A]nalysis of the degree of control exercised by the publishers over the manner and means of performance by the carriers furnishes the basic means of discerning whether the carriers are independent contractors or employees."

its employees. The situation was thus very similar to that in *Chicago R.I. & P.R. Co. v. Bond*, 240 U.S. 449, 456, 36 S.Ct. 403, 406, 60 L.Ed. 735 (1916) where the contractual arrangement was "not the engagement of a servant submitting to subordination and subject momentarily to superintendence, but of one capable of independent action to be judged by its results." This was particularly apparent in a great many of the contracts here because a substantial portion of the contractually acquired services which are in question involved scientific, engineering, technical, and other highly skilled or professional personnel who were fully capable of exercising independent judgment in performing their services and were expected to do so. And, by way of contrast, concerning some of the contracts for the more menial services, where substantial independent judgment was not an ordinary factor, and control and supervision could be more easily found in a mere order, the district court agreed with the Civil Service Commission that supervision was nonexistent in the sense intended by the employee standards.[26]

■ Without supervision by NASA, the employees of the contractors for the supporting services cannot be viewed as employees for subsection (b)(2) purposes who must be appointed in accordance with the civil service laws. In this case, it cannot be said that the Civil Service Commission's decision was in error when on the basis of the facts it found it based its conclusion concerning employee-independent contractor status on the *degree of supervision* exercised over the work performed.

The district court did criticize the Commission's insistence that all six of the "*Pellerzi*" standards be met (J.A. 449). Appellee's argument that the contractor's em-

ployees are subsection (b)(2) employees, to the extent it is based on application of the Pellerzi standards, has a facial validity, but it loses its vitality when the activities of the individuals in question are weighed against the all-important sixth standard concerning supervision. For example, had the Commission found that these individuals were not in an employer-employee relationship with NASA even where very close supervision was imposed, because, perhaps, one or several of the other Pellerzi standards was not met, its decision might have been subject to more criticism. In this case, however, the Commission's insistence that all six Pellerzi standards be met was functionally equivalent to a requirement that only the decisive "supervision" standard be met, since *there was no contract among the 32 reviewed where the sixth factor—NASA supervision—was present*. It would have been improper for the district court to have rejected the Commission's conclusions simply because it insisted that all six Pellerzi elements coexist. But unless special significance were accorded the critical sixth factor, such an approach would have been equivalent to holding that employee status could be found even in the absence of supervision by the alleged employer. We would disagree generally with such conclusion.

Since we do not disagree with the district court's conclusion that all six Pellerzi elements need not be present, we turn to the all-important matter of how the district court construed the supervision requirement. The court supplanted the Sixth Standard with a test that "requires only a showing that 'the inherent nature of the service, or the manner in which it is provided, reasonably requires, directly or indirectly, federal direction or supervision of contractor employees.' "[27] This tracks some of

---

26. This finding referred to the plant operation support services at Michond Assembly Facility under Contracts Nos. NAS 8–14017, 8–26887. Such services included: custodial, plant engineering and maintenance, transportation, supplies, food, security and fire protection. Also, of a non-menial character; photographic, medical, telecommunications and documentation (J.A. 494–96). A similar result was reached

with respect to the Global Associates Contract No. NAS 8–26896 for facility operating services (J.A. 489, 492–94) and concerning Contracts Nos. NAS 8–14110 and 8–21808 insofar as they contracted for custodial, refuse collection, laundry, and photo repair (J.A. 481–88).

27. J.A. 449.

the language in the Pellerzi opinion but fails to reach an important feature added by the Mondello Supplement which calls attention to the requirement of "supervision . . . by Government employees" (J.A. 1514). The Mondello Supplement recognized that the "touchstone of legality under the personnel laws is whether the contract creates what is tantamount to an employer-employee relationship between the Government and the employee of the contractor" (J.A. 1512). The Supplement recognized that the *basic criteria* by which this relationship is judged are set forth in 5 U.S.C. § 2105(a), and stated further:

> The six elements . . . relate principally to the third statutory criterion concerning supervision of a contractor employee by a Federal officer or employee. *If the contract terms permit such supervision, or if in the actual performance of the contract such supervision is conducted, the test is met.*

J.A. 1513 (emphasis added). The standard used by the district court is an incomplete expression of the proper standard by which contracts for services as various as those here involved should be tested. Moreover, that standard focuses incorrectly on what the nature of the questioned service "reasonably requires" and ignores the always critical factor of who actually exercises the supervision over the manner and "performance of the duties of [the] position." [28]

Additional defects in the standard need not be mentioned because we view the decision in *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974), as strongly persuasive if not completely controlling on the facts here present. Kelley was an employee of Pacific Motor Trucking Company (PMT), a subsidiary wholly owned by the Southern Pacific Company that operates the Southern Pacific Railroad. The two companies had a contractual relationship covering PMT's trucking operations which were operated primarily in conjunction with the railroad operations of its parent company. In accordance with its contract with the railroad, PMT would unload automobiles that had been transported over the rail lines of the Southern Pacific. In the process of such unloading operations, Southern Pacific employees in the area would occasionally consult with PMT employees about the unloading process, but PMT supervisors controlled and directed the actual day-to-day operations.

One day, Kelley was injured in the process of unloading automobiles. Claiming that his injuries were caused by the negligence of the Southern Pacific Railroad, Kelley sued under the Federal Employees' Liability Act (FELA) on the alleged ground that he was covered thereby as an employee of the railroad.

The trial court found that Kelley in his work was within the coverage of the FELA. In support of its judgment it asserted that unloading the automobiles was the "railroad's responsibility," that the railroad supplied the unloading ramps and owned the area where PMT employers worked, that the "responsibility for supervision and control of the unloading operation was [the railroad's]," and that in effect "PMT employees were agents of the railroad . . . in fulfillment of a non-delegable duty of defendant Southern Pacific Company." 419 U.S. at 322, 95 S.Ct. at 475. The Court of Appeals reversed and the Supreme Court granted certiorari.

In an opinion by Justice Marshall, the Supreme Court decided that the trial court applied an erroneous legal standard when it held that Kelley was covered by the Federal Employers' Liability Act because of the "traditional agency relationship" between the railroad and PMT. In its place, the court held that the proper standard required proof of a "master-servant relationship . . . determined by reference to common-law principles." It pointed approvingly to section 220(1) of the Restatement (Second) of Agency that defines a servant as "a person employed to perform services in the affairs of another and who with respect to the *physical conduct* in the performance of the services is subject to the

**28.** 5 U.S.C. § 2105(a).

other's control or right to control." 419 U.S. at 324, 95 S.Ct. at 476 (emphasis added).

■ The opinion ruled that Kelley was not (1) a borrowed servant, or (2) employed by two masters simultaneously, and eventually rejected the third possibility that he was (3) a subservant of a company that was in turn a servant of the railroad. While PMT was clearly an agent of the railroad, the opinion stated that a "finding of agency is not tantamount to a finding of a master-servant relationship" and that the "test" applied by the district court was "too broad." A similar characterization seems appropriate for the test used by the district court here. Actually the relationship in this case between the Government and the numerous contractors is not as close as the relationship which existed between Pacific Motor and the parent railroad company. The contracts here were arms-length transactions and not all of the services were rendered on government property. But it is in the nature of the supervision of the contractor's employees that the two cases are most alike: in both cases, the "day-to-day" supervision of the "physical conduct" on "the details of the job performed by the individual [employees of the contractor]" was in the independent contractor—and the decision of the Supreme Court with respect to this vital element is completely destructive of the standard used and decision reached here by the district court. Like *Kelley*, we find that the standard used here by the trial court was "too broad." *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), also supports this conclusion.

### IV

The district court found a second error in the Commission's test of employee status. The Civil Service Commission made its decision "in accordance with the instructions given by the Office of the U.S. Attorney" (J.A. 515). Those instructions included the following admonition: "with regard to the sixth element, relatively *continuous,* close supervision of a substantial number of con-

tractor employees must be present and must be shown to be related to one of the following requirements, '(a) to adequately protect the government's interest, or (b) to retain control of the function involved, or (c) to retain full personal responsibility for the function supported in a duly authorized Federal officer or employee' " (J.A. 515; emphasis added).

The final three specifications of this order are taken verbatim from the Pellerzi Standards. The controversy does not concern them. Rather, the district court found no support in the Pellerzi or Mondello opinions for the word "continuous" modifying "supervision" (J.A. 450–51). The Pellerzi opinion indicated employee status when, all else being present, "[t]he inherent nature of the service . . . reasonably requires directly or indirectly, government direction or supervision of contractor employees . . . ." (J.A. 352). The Mondello Supplement interpreted the sixth Pellerzi factor to mean "a requirement for close supervision of contractor employees by Government employees" (J.A. 1514). To construe the phrases "reasonably requires . . . supervision" and "a requirement for close supervision" to mean "relatively continuous, close supervision" (emphasis added), is a very natural and proper interpretation. "Close" supervision, standing alone, evokes the implication of *continuity* of supervision. And the modifier "relatively" makes the Commission's standard unassailable. The validity of the statement is further buttressed by its placement in juxtaposition to the assertion that "sporadic supervision of an individual . . . may be ignored" (J.A. 442; emphasis added).

### V

■ The district court was not required to send this matter to the Civil Service Commission, but it chose to do so in an exercise of its discretion. "Under the doctrine of primary jurisdiction, a court may entertain an action for permanent relief and defer its consideration of the merits until an agency 'with special competence' in the field has ruled on the issues . . . . .

This doctrine has application to the [agency] . . . *even assuming that its function is advisory* since it has the special competence and experience that is the life and reason of the primary jurisdiction rule." *Wheelabrator Corp. v. Chafee*, 147 U.S.App.D.C. 238, 248, 455 F.2d 1306, 1316 (1971) (emphasis added). "Whether the agency happens to be expert or not, a court should not act upon subject matter that is peculiarly within the agency's specialized field without taking into account what the agency has to offer . . . ." K. Davis, 3 Administrative Law Treatise (1958) § 19.01 at 5 (discussing primary jurisdiction). In *NLRB v. Hearst Publications*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), the labor board's decision on a statutory question admittedly did not come about because of any discretionary exercise of primary jurisdiction. Nevertheless, the Court's justification for deferring to the Board, even on a matter purely of law, is instructive here:

> Everyday experience in the administration of the statute gives [the Board] familiarity with the circumstances and backgrounds of employment relationships . . . . The experience thus acquired must be brought frequently to bear on the question who is an employee under the Act. Resolving that question . . "belongs to the usual administrative routine" of the Board. . . .
>
> . . . [T]he Board's determination that specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law.

322 U.S. at 130–31, 64 S.Ct. at 860. Here, it is the Civil Service Commission that possesses the expertise. The district court's action in sending the case to the Civil Service Commission rather than an exercise of primary jurisdiction could alternatively be analogized to the appointment of a special master. The time limit given to the Commission for response supports that interpretation of the court's action. If the procedure followed was that of appointing a master, however, the district court's review is every bit as limited as under the primary jurisdiction theory, for Federal Rule of Civil Procedure 53(e)(2) provides: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."

Here the Civil Service Commission, as noted above, found an absence of supervision in all 32 contracts in dispute. There is substantial support in the record for the Commission's conclusions. While the fact that it believed all six Pellerzi standards had to be met in order for an employer-employee relationship to exist was incorrect, this error did not affect the weight of the Commission's decision on the critical sixth Pellerzi standard on supervision. Under the circumstances of this case, it was error for the court to reject the conclusions of the Commission on the application of the sixth standard to these contracts.

VI

In addition to the foregoing, there are additional grounds for holding that subsection (b)(2) is not controlling here insofar as the contractors' employees are concerned. As this opinion has already stated, the contractors' employees have not been shown by appellee to be employees of the United States who must be appointed in accordance with subsection (b)(2) and concomitantly as civil service employees under the civil service laws. This is because subsection (b)(5) validly authorized NASA to enter into separate contracts under which certain services contracted for were performed by employees of the contractor, and in the performance of such contracts NASA did not treat the contractors' employees in such a manner that they became employees of NASA or the United States.

██ In urging that we adopt a contrary conclusion—particularly in urging us to conclude that contractors' employees cannot be used to perform the agency's work functions in the manner and for the purposes here disclosed—appellee effectively reads subsection (b)(5) as though it were contradicted and controlled by subsection (b)(2). Appellee argues that "[t]here is nothing in Section 203(b)(5) of the NASA statute . .

which *repeals* Section 203(b)(2) or which authorizes NASA to evade and circumvent Section 203(b)(2) . . ." (Appellee Supp. Br. at 4; emphasis added). This contention is falsely premised on the reasoning that subsection (b)(5) must repeal subsection (b)(2) in order to validate the support service contracts, but such argument fails to give subsection (b)(5) its proper due. It fails to recognize the potential that Congress intended for subsection (b)(5) to assist in the performance of NASA's work. Subsection (b)(5) need not "repeal" subsection (b)(2) in order to achieve its separate status. To the extent that it provides for a *specific* manner in which NASA may carry out some of its work, it is a specific exemption from the general provisions of subsection (b)(2) and must be recognized as such.

■ The long established rule of statutory construction "gives precedence to the terms of the more specific statute where a general statute and a specific statute speak to the same concern, even if the general provision was enacted later." *Simpson v. United States,* 435 U.S. 6, 15, 98 S. Ct. 909, 914, 55 L.Ed.2d 70 (1978).[29] Here, subsection (b)(2) is general: it is a general authorization for the Administrator to appoint and fix the compensation of such officers and employees under the Civil Service laws to perform NASA's functions to the extent that it may consider desirable, subject to certain personnel limits and with certain leeway in some salaries. Subsection (b)(5), however, is more specific: it is in addition to (b)(2) and it authorizes the Administrator to enter into "contracts . . or other transactions *as may be necessary* in the conduct of [NASA's] work and on *such terms as it may deem appropriate*" (emphasis added). Thus, as Speaker McCormack clearly stated,[30] Congress intended NASA to perform its assigned functions under *both* subsections and in this respect the statute confers a broad discretion upon NASA to use subsection (b)(5) to the extent that it considers "may be necessary in the conduct of [its] work . . . ."

■ The force of subsection (b)(5) as specifying a separate means, *independent* of subsection (b)(2), for performing NASA's functions is further strengthened by its location in the statute after subsection (b)(2). The established rule is that if there exists a conflict in the provisions of the same act, the last provision in point of arrangement must control.[31] Thus, while subsection

---

**29.** However inclusive may be the general language of a statute, it "will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704.

*MacEvoy Co. v. United States,* 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163 (1944).

Courts have relied on this principle on many occasions. *E. g., Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); *Missouri v. Ross,* 299 U.S. 72, 76, 57 S.Ct. 60, 81 L.Ed. 46 (1936); *Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932); *Kepner v. United States,* 195 U.S. 100, 125, 24 S.Ct. 797, 49 L.Ed. 114 (1904); *United States v. Chase,* 135 U.S. 255, 260, 10 S.Ct. 756, 34 L.Ed. 117 (1890); *United States v. Jones,* 131 U.S. 1, 19, 9 S.Ct. 669, 33 L.Ed. 90 (1889); *International Longshoremen's and Warehousemen's Union v. Wirtz,* 170 F.2d 183, 187 (9th Cir. 1948); cert. denied, 336 U.S. 919, 69 S.Ct. 641, 93 L.Ed. 1082 (1949); *Detrich v. Howard,* 155 F.2d

307, 309 (7th Cir. 1946); *La Page v. United States,* 146 F.2d 536, 538 (8th Cir. 1945); *United States v. City of Chester,* 144 F.2d 415, 421 (3d Cir. 1944); *Callahan v. United States,* 74 U.S.App.D.C. 281, 282, 122 F.2d 216, 217 (1941). 2A C. Sands, Sutherland Statutory Construction, §§ 47.16, 47.17, at 101–09 (4th ed. 1973).

**30.** *See* text at —— of 188 U.S.App.D.C., 502 of 580 F.2d *supra.*

**31.** *E. g., Buttfield v. Stranahan,* 192 U.S. 470, 494–96, 24 S.Ct. 349, 48 L.Ed. 525 (1904); *Inter-Continental Promotions, Inc. v. MacDonald,* 367 F.2d 293, 301 (5th Cir. 1966), cert. denied, 393 U.S. 834, 89 S.Ct. 105, 21 L.Ed.2d 104 (1968); *Hudson Motor Car Co. v. Hertz,* 121 F.2d 326, 330 (6th Cir.), cert. denied, 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 557 (1941); *United States v. Updike,* 25 F.2d 746, 752 (D.C.Neb. 1928), aff'd, 32 F.2d 1 (8th Cir. 1929), aff'd, 281 U.S. 489, 50 S.Ct. 367, 74 L.Ed. 984 (1930); *United States v. Daniels,* 279 F. 844, 849 (2d Cir. 1922); *Great Northern R. Co. v. United States,* 155 F. 945, 959 (8th Cir. 1907), aff'd, 208 U.S. 452, 28 S.Ct. 313, 52 L.Ed. 567 (1908); *United States v. Jackson,* 143 F. 783, 787 (9th Cir. 1906); *In re Richards,* 96 F. 935, 939 (7th

(b)(5) does not repeal subsection (b)(2), and only conflicts with it to the extent that it provides for additional authority, it is clear that subsection (b)(5) does provide a sepa-

Cir. 1899); *Skeeles v. United States,* 95 F.Supp. 242, 247, 118 Ct.Cl. 362, 367, *cert. denied,* 341 U.S. 948, 71 S.Ct. 1014, 95 L.Ed. 1371 (1951); *In re Jacobs,* 7 F.Supp. 749, 752 (N.D.Ill.), *appeal dismissed,* 73 F.2d 1002 (7th Cir. 1934); *Alabama State Bd. of Health v. Chambers Cty.,* 335 So.2d 653, 655 (Ala.1976); *CableVision, Inc. v. Freeman,* 324 So.2d 149, 152–53 (Fla. App.1975), *appeal dismissed,* 336 So.2d 1180 (Fla.1976), *appeal dismissed,* 429 U.S. 1032, 97 S.Ct. 723, 50 L.Ed.2d 743 (1977); *In re Ashworth,* 291 Ala. 723, 728, 287 So.2d 843, 847 (1974); *Bible & Godwin Constr. Co. v. Faener Corp.,* 504 S.W.2d 370, 372 (Tenn.1974); *State v. Crenshaw,* 287 Ala. 139, 142, 249 So.2d 622, 624 (1971); *Wilkins v. Woolf,* 281 Ala. 693, 701, 208 So.2d 74, 80 (1968); *State v. Boca Raton,* 172 So.2d 230, 233 (Fla.1965); *Schneider v. Forcier,* 67 Wash.2d 161, 164, 406 P.2d 935, 937 (1965); *Fink v. Cold Spring Granite Co.,* 262 Minn. 393, 398, 115 N.W.2d 22, 26 (1962); *Stoller v. State,* 171 Neb. 93, 98, 105 N.W.2d 852, 856–57 (1960); *State v. Hialeah,* 109 So.2d 368, 370 (Fla.1959); *Town of Homecroft v. Macbeth,* 238 Ind. 57, 63, 148 N.E.2d 563, 567 (1958); *Gilbertson v. Culinary Alliance & Bartenders' Union,* 204 Or. 326, 336, 282 P.2d 632, 638 (1955); *City of Petaluma v. Pacific Tel. & Tel. Co.,* 44 Cal.2d 284, 289, 282 P.2d 43, 46 (1955); *Application of Oklahoma Turnpike Authority,* 206 Okl. 617, 624, 246 P.2d 327, 331 (1952); *Ogle v. Tennessee Eastman Corp.,* 185 Tenn. 527, 529, 206 S.W.2d 909, 910 (1947); *Hartford Acci. & Indem. Co. v. City of Tulare,* 30 Cal.2d 832, 836, 186 P.2d 121, 123 (1947); *Johnson v. State,* 157 Fla. 685, 693, 27 So.2d 276, 282 (1946); *cert. denied,* 329 U.S. 799, 67 S.Ct. 491, 91 L.Ed. 683 (1947); *Woodroof v. City of Nashville,* 183 Tenn. 483, 486, 192 S.W.2d 1013, 1015 (1946); *Tyler v. Huiet,* 199 Ga. 845, 849, 36 S.E.2d 358, 361 (1945); *People v. Moroney,* 24 Cal.2d 638, 642, 150 P.2d 888, 891 (1944); *Feldman v. South Carolina Tax Comm.,* 203 S.C. 49, 52, 26 S.E.2d 22, 24 (1943); *Jacoby v. Missouri Valley Drainage Dist.,* 349 Mo. 818, 830, 163 S.W.2d 930, 938 (1942); *Commonwealth v. Chester Cty. Light & Power Co.,* 339 Pa. 97, 100, 14 A.2d 314, 316 (1940); *Ebbert v. Tucker,* 123 W.Va. 385, 392, 15 S.E.2d 583, 587 (1941); *Darby v. De Loach,* 190 Ga. 499, 501, 9 S.E.2d 626, 627 (1940); *Hudson v. State Compensation Commr.,* 121 W.Va. 461, 465, 5 S.E.2d 108, 111 (1939); *Sealed Power Corp. v. Stokes,* 174 Tenn. 493, 498, 127 S.W.2d 114, 117 (1939); *Markel v. Glassmeyer,* 137 Neb. 243, 246, 288 N.W. 821, 823 (1939); *Enyeart v. City of Lincoln,* 136 Neb. 146, 150, 285 N.W. 314, 317 (1939); *Gentry v. Blinn,* 184 Okl. 9, 12, 84 P.2d 27, 29 (1938); *Chilen v. Commercial Casualty Ins. Co.,* 135 Neb. 619, 626, 283 N.W. 366, 370 (1938); *Burton v. Denver,* 99 Colo. 207, 211, 61 P.2d 856, 858 (1936); *South-*

*ern R. Co. v. Grigsby,* 155 Tenn. 285, 288, 292 S.W. 3, 5 (1927); *Coker v. Wilkinson,* 142 Miss. 1, 2, 106 So. 886, 887 (1926); *State v. Tullock,* 72 Mont. 482, 484, 234 P. 277, 278 (1925); *State v. Burchfield Bros.,* 211 Ala. 30, 32, 99 So. 198, 200–01 (1924); *Board of Drainage Commrs. v. Carey,* 30 Ga.App. 378, 378, 118 S.E. 445, 445 (1923); *Richardson v. Browning,* 61 Cal.App. 110, 113, 214 P. 281, 283 (1923); *State v. Industrial Comm. of Ohio,* 105 Ohio St. 103, 106, 136 N.E. 896, 898 (1922); *State v. Public Service Comm.,* 101 Wash. 601, 606, 172 P. 890, 893 (1918); *Davis v. State,* 16 Ala.App. 397, 399, 78 So. 313, 314 (1918); *State v. Gideon,* 273 Mo. 79, 81, 199 S.W. 948, 949 (1917); *Board of Park Commrs. v. City of Nashville,* 134 Tenn. 612, 620, 185 S.W. 694, 699 (1916); *Board of Education v. Tyler County Court,* 77 W.Va. 523, 527, 87 S.E. 870, 872 (1915); *Cox v. Timm,* 182 Ind. 7, 12, 105 N.E. 479, 482 (1914); *Woodring v. McCaslin,* 182 Ind. 134, 137, 104 N.E. 759, 761 (1914); *Curless v. Watson,* 54 Ind.App. 110, 118, 100 N.E. 576, 580 (1913); *State v. St. Louis,* 241 Mo. 231, 241, 145 S.W. 801, 807 (1912); *Gish v. Shaver,* 140 Ky. 647, 649, 131 S.W. 515, 516–17 (1910); *Ex parte Smith,* 33 Nev. 466, 474, 111 P. 930, 935 (1910); *Shutt v. State,* 173 Ind. 689, 691, 89 N.E. 6, 7 (1909); *Peterson v. People,* 129 Ill.App. 55, 57 (1906); *Harvey Coal & Coke Co. v. Dillon,* 59 W.Va. 605, 625, 53 S.E. 928, 940 (1905); *Joseph Speidel Grocery Co. v. Warder,* 56 W.Va. 602, 605, 49 S.E. 534, 536 (1904); *Hand v. Stapleton,* 135 Ala. 156, 158, 33 So. 689, 690 (1902); *Omaha Real Estate & Trust Co. v. Reiter,* 47 Neb. 592, 599, 66 N.W. 658, 663 (1896); *Ex parte Hewlett,* 22 Nev. 333, 335, 40 P. 96, 97–98 (1895); *Howard v. Bangor & A. R. Co.,* 86 Me. 387, 388, 29 A. 1101, 1102 (1894); *People v. Dobbins,* 73 Cal. 257, 259, 14 P. 860, 861 (1887); *In re Yick Wo,* 68 Cal. 294, 302, 9 P. 139, 145 (1885), *rev'd on other grounds,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Branagan v. Dulaney,* 8 Colo. 408, 411, 8 P. 669, 671 (1885) (overruled on ground that statutes not in conflict in *Calhoun Gold-Min. Co. v. Ajax Gold-Min. Co.,* 27 Colo. 1, 59 P. 607 (1899), *aff'd,* 182 U.S. 499, 21 S.Ct. 885, 45 L.Ed. 1200 (1901)); *Albertson v. State,* 9 Neb. 429, 439, 2 N.W. 742, 748 (1879); *see Stansell v. Fowler,* 113 Ga.App. 377, 381, 147 S.E.2d 793, 796 (1966); *Sharer v. Hotel Corp. of America,* 144 So.2d 813, 816–17 (Fla.1962); *Jolly v. Atlantic Greyhound Corp.,* 207 S.C. 1, 4, 35 S.E.2d 42, 44–5 (1945); *State v. Ayer,* 9 Wash.2d 188, 193, 114 P.2d 168, 171 (1941); *Stiers v. Vrooman,* 234 Mo.App. 161, 168, 115 S.W.2d 84, 89 (1938); *Woodbury v. Wilson,* 133 Me. 329, 332, 117 A. 708, 710 (1935); *Marengo County v. Wilcox County,* 215 Ala. 640, 643, 112 So. 243, 245 (1927); *State v. Board of Commrs.,* 56 Mont. 355, 358, 185 P. 147, 149 (1919); *Commercial Trust Co. v. Hudson Coun-*

rate, alternative, independent means of performing NASA's statutory duties which Congress contemplated would be exercised contemporaneously with the authority conferred by subsection (b)(2) in conformance with NASA's discretion and to the extent permitted by funds available from the yearly appropriations of Congress.

Finally, the relative utilization of civil service employees and employees of support service contractors at NASA in the years surrounding the reduction-in-force provides conclusive documentation that Congress intended subsection (b)(5) to authorize the support service contracting which is challenged here.[32] In the fiscal year 1967 NASA budget hearings regarding the use of support service contract personnel, which were held before the Senate Committee on

Aeronautical and Space Sciences, NASA stated that during fiscal year 1965, the average number of *contractor employees* working at its centers was about 16,800. NASA stated that this figure would rise to about 22,400 in fiscal year 1966 and to about 24,900 in fiscal year 1967, primarily as a result of the increase in operational activities at the Kennedy Space Center.[33] These contractor employees were in addition to NASA's civil service personnel *ceilings* for fiscal years 1965, 1966, and 1967 of about 33,200, 33,900, and 34,300 respectively.[34] Thus, although the number of civil service personnel had been estimated to increase by only about 1,100 during those three years,[35] the corresponding increase of about 8,100 contractor employees during the same period, estimated to bring the

*ty Bd. of Taxation,* 86 N.J.L. 424, 430, 92 A. 263, 267 *aff'd,* 87 N.J.L. 179, 92 A. 799 (1914); *Calhoun Gold-Min. Co. v. Ajax Gold-Min. Co.,* 27 Colo. 1, 10, 59 P. 607, 613 (1899), *aff'd,* 182 U.S. 499, 21 S.Ct. 885, 45 L.Ed. 1200 (1901).

**32.** The Congressional intent to authorize NASA to enter into support service contracts is evident from the authorization laws and appropriations which it enacted. For example, in P.L. 91–126 enacted on Nov. 26, 1969, Congress clearly authorized "support services contracts" to be funded from the " 'Research and program management' appropriations" (83 Stat. 197) and thereafter appropriated $678,725,000 to NASA for "Research and Program Management" with the proviso "[t]hat *contracts* may be entered into under this appropriation *for maintenance and operation of facilities, and for other services,* to be provided during the next fiscal year." (83 Stat. 230; emphasis added). This same pattern of authorization and appropriation continued. *E. g.,* 84 Stat. 370, 1449; 85 Stat. 174, 277; 86 Stat. 159, 545. In prior years, going back as far as the Act of June 28, 1965, the authorization for "Administrative operations" included "support services contracts" and the appropriation was similarly worded. *E. g.,* 79 Stat. 193, 534; 80 Stat. 337, 675; 81 Stat. 169, 385; 82 Stat. 281, 945.

**33.** The Report to Congress by the Comptroller General dated June 9, 1967 stated *inter alia*:
NASA, consistent with its policy, has relied heavily over the years on the capabilities of industry to carry out its activities. In response to queries by the Senate Committee on Aeronautical and Space Sciences during the fiscal year 1967 NASA budget authorization hearings regarding the use of contract personnel, NASA stated that, during fiscal

year 1965, the average number of contractor personnel working at its Centers was about 16,800. NASA stated also that the average number of such personnel would rise to about 22,400 in fiscal year 1966 and to about 24,900 in fiscal year 1967 primarily as a result of the increase in operational activities at the Kennedy Space Center. NASA's civil service personnel ceilings for fiscal years 1965, 1966, and 1967 were about 33,200, 33,900, and 34,300, respectively. Thus, although the number of civil service personnel was estimated to increase by about 1,100 during these fiscal years, the corresponding estimated increase of about 8,100 contractor personnel during the same period contemplated a continuing and extensive use of contractor personnel rather than civil service personnel to carry out its activities.
Comptroller General of the United States, Report to the Congress on Potential Savings Available Through Use of Civil Service Rather than Contractor-furnished Employees for Certain Support Services (June, 1967) (J.A. 266–67).

**34.** *Id.* at J.A. 267. In those three years, 1965, 1966, and 1967, NASA hired civil service employees up to and slightly beyond those ceilings: In 1965, 1966, and 1967, NASA hired 34,049, 35,708, and 35,860 civil service employees respectively. United States Department of Commerce, Bureau of the Census, Statistical Abstract of the United States, No. 569, at 398 (1968).

**35.** The actual increase in civil service employees in those three years was slightly over 1,800, which is about 700 more than the estimate referred to in the text.

total to 24,900, in excess of the civil service *ceilings* was fully disclosed to Congress, and did not evoke Congressional opposition— and Congress adopted the appropriations necessary to pay this very substantial number of contractor employees. As noted above, the Congressional policy of favoring support service contracts while cutting back on civil service employment continued after the reduction-in-force in question here.[36] This demonstrates that subject support service contracts, entered into pursuant to the authority of subsection (b)(5) to the magnitude that eventually evolved, were fully within the intendment of Congress.

Thus, even viewing appellee's argument in its most favorable light, appellee would not prevail: under well-settled rules of statutory construction, on the facts of this case and under the applicable statute, subsection (b)(5) would still operate independently of subsection (b)(2) and authorize NASA to enter into contracts for support services to be furnished by employees of the contractors as it did. And since the contractors' employees here in question are not civil service employees, and are not required to be civil service employees, they are not "competing employees in a reduction in force" within the meaning of 5 U.S.C. § 3502, and are not subject to being bumped by civil service employees.[37] Their contracts were outside the civil service laws, and the manner in which they were carried out did not violate their terms and bring them within those statutes.

## CONCLUSION

For the reasons set forth in this opinion, we find that it was clearly erroneous for the district court to find that 22 of the 32 contracts were invalid *in toto* and that two others were invalid in part on the ground that persons employed by the contractors under these contracts served in an employer-employee relationship with the United States. We therefore vacate those portions of the Summary Judgment and Order of August 12, 1976 that declared 22 contracts and parts of two others null and void and that declared null and void the 1967 reduction-in-force actions taken by NASA. The portion of the Summary Judgment and Order upholding eight contracts and parts of two others is affirmed. The vacated portions of the judgment are remanded to the district court with instructions to enter judgment for the defendants consistent with this opinion.

*Judgment accordingly.*

---

**36.** *See* note 20 *supra.*

**37.** It is self evident from the plain language of the statutes pointed to by appellants that the use of contractors' employees to perform necessary work for NASA did not involve any violation of either 31 U.S.C. § 665(a) or 31 U.S.C. § 665(b). 31 U.S.C. § 665 (1970) provides:

(a) No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any purpose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law.

(b) No officer or employee of the United States shall accept voluntary service for the United States or employ personal service in excess of that authorized by law, except in cases of emergency involving the safety of human life or the protection of property.